UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Judith Berger,

        Plaintiff,                                                        Case No.: 3:09-CV-14157

        v.                                                           **ORDER**

Philip Morris USA Inc.,

        Defendant.

This is an "*Engle*-progeny" tobacco product liability case, in which plaintiff Judith Berger sued defendant Philip Morris USA, Inc. (PMUSA) for injuries allegedly resulting from PMUSA's tortious conduct.[1]

A crucial issue in this case, trial of which recently concluded, was whether Mrs. Berger could use the "*Engle* findings" to establish her claims. Doing so requires membership in the decertified *Engle* class. To qualify for class membership (and thus, be eligible to use the "*Engle* findings"), Mrs. Berger had to prove, among other requirements, that her Chronic Obstructive Pulmonary Disease (COPD) "manifested" on or before November 21, 1996.

---

[1] "*Engle*-progeny" refers to the cases filed following the Florida Supreme Court's opinion in *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla. 2006). In *Engle*, the Court, while affirming a jury's factual findings ("*Engle* findings") regarding tobacco company misconduct, decertified the class that the trial court had certified. The Court in *Engle* gave the members of the decertified class one year within which to file individual lawsuits.

    For a detailed history of the *Engle* litigation, *see Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1326-29 (11th Cir. 2010) and *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011).

Before trial, the parties submitted disparate proposals on how properly to instruct the jury on manifestation. Florida law on this issue is unsettled, though presently is pending for resolution before the Florida Supreme Court. *R.J. Reynolds Tobacco Co. v. Ciccone*, SC13-2415, 2014 WL 2885424 (Fla. June 13, 2014).

Mrs. Berger contended that the Florida Supreme Court will affirm the decision in *R.J. Reynolds Tobacco Co. v. Ciccone*, 123 So.3d 604 (Fla. 4th DCA 2013), *review granted*, SC13-2415, 2014 WL 2885424 (Fla. June 13, 2014)).

PMUSA asserted that the Florida Supreme Court will endorse the decision in *Castleman v. R.J. Reynolds Tobacco Co.*, 97 So.3d 875 (Fla. 1st DCA 2012).

For the following reasons, I agreed with Mrs. Berger's contention that it is more likely that the Court will affirm *Ciccone* and reject *Castleman*. I therefore fashioned my instruction on "manifested" on the basis of *Ciccone*. 123 So.3d at 614-617.

**Discussion**

**1. Current Florida Law**

The Florida Supreme Court in *Engle* stated that "the class should include only those people who were affected in the past or who were presently suffering [from a tobacco-related disease as of November 21, 1996,] the time the class was recertified by the trial court." 945 So.2d at 1275. The critical event, the Court explained, "is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." *Id.*

Determination of the proper jury instruction thus necessitates an inquiry into what test accurately reflects the Florida Supreme Court's intent in using the term "manifested."

In *Castleman*, the plaintiff's smoking-related diseases or conditions had shown symptoms in the early 1990's, but medical providers had not classified and described the condition as smoking-related until 1998. 97 So.3d at 876-77.

In attempting to decipher *Engle's* use of the term "manifested," the Court in *Castleman* turned to *Frazier v. Phillip Morris*, 89 So.3d 937 (Fla. 3d DCA 2012), *reh'g denied* (June 8, 2012), *review granted*, SC12-1401, 2013 WL 7149427 (Fla. Sept. 3, 2013), where the Third District Court of Appeal considered when a smoking-related disease or condition manifested in the context of the statute of limitations for "creeping diseases," *see* 97 So.3d at 876-77 (citing *Frazier*, 89 So.3d at 944), such as, in this case, COPD.[2]

In *Frazier*, the Court borrowed language both from *Engle* regarding manifestation and class cut-off and, as well, from Florida products liability law relating to creeping diseases. *Frazier*, 89 So.3d at 944-45. The Court held that Florida's four-year limitations statute accrues only when tobacco-related symptoms become manifest, that is, when they disclose to the prospective claimant the existence of a disease or medical condition caused by tobacco use. *Id.* (quoting *Carter v. Brown & Williamson Tobacco Corp.*, 778 So.2d 932, 934 (Fla.2000)) (citing *Engle*, 945 So.2d at 1246).

Adopting, apparently, a literal translation of the definition of manifestation from the statute of limitations, the Court in *Castleman* "appl[ied] the reasoning in *Frazier*, [] conclud[ing] that because [plaintiff] did not attribute his illness to his history of smoking until 1998, he was not aware

---

[2] "COPD qualifies as a 'creeping disease,' which is defined as 'a disease acquired over a period of years as a result of long-term exposure to injurious substances.' " *Belanger v. R.J. Reynolds Tobacco Co.,* 140 So.3d 598, 601 (Fla. 3d DCA 2014) (citing *Carter v. Brown & Williamson Tobacco Corp.*, 778 So.2d 932, 936 (Fla.2000) (citing *Copeland v. Armstrong Cork Co.*, 447 So.2d 922, 926 (Fla. 3d DCA 1984)).

of sufficient facts to permit the filing of a non-frivolous tort law suit against the tobacco company before 1998." 97 So.3d at 877. Because "his conditions had not manifested themselves as tobacco-related illness . . . on or before the cutoff date of November 21, 1996," plaintiff did not qualify for *Engle* class membership, making his lawsuit time barred. *Id.* (internal quotations omitted); *accord Damianakis v. Philip Morris USA Inc.*, 2D13-246, 2014 WL 3537019 (Fla. 2d DCA 2014) (holding that the defendant had stipulated to the issue of when and where plaintiff's disease manifested, while appearing to favor a "causally related" standard); *Rearick v. R.J. Reynolds Tobacco Co.*, 68 So.3d 944, 945 (Fla. 3d DCA 2011) ("The qualification for membership in the *Engle* class requires plaintiff to show that the decedent was a resident of the state of Florida at the time of a 'medical diagnosis' of a smoking-related disease or at the time evidence of the causal relationship of the cause of action had [otherwise] manifested itself.").

One year later, Florida's Fourth District Court of Appeal in *Ciccone* adopted a far different approach to manifestation for *Engle* class purposes. Taking issue with borrowing the definition of "manifestation" from creeping disease statute of limitations cases, the Court stated that such an approach "fails to take into account the differences in policy between the accrual of a cause of action for [such] purposes and pinpointing a date for class membership by looking back in time from the 2006 Engle decision." 123 So.2d at 612-13. The Florida Supreme Court's intent in creating a manifestation requirement, according to *Ciccone*, was merely to keep the class from being open ended – not to impose limit potential *Engle* class members to persons who had known enough to file a non-frivolous tort lawsuit on or before November 21, 1996. *Id.* at 614.

In seeking a "preferable definition," *Ciccone* attempted to capture a "key point in determining *Engle* class membership [–] pinpointing when the plaintiff began 'suffering' from the

4

smoking-related illness or when the illness 'manifested.' " *Id*. at 615 (citing *Engle*, 945 So.2d at 1275).  The Court, looking to insurance coverage cases centering on "symptoms" as being a natural outgrowth of "suffering," held that manifestation occurs at "[t]hat point in time when the sickness or disease becomes symptomatic and not necessarily when the exact nature of sickness or disease is diagnosed by a physician after extensive testing." *Id*. at 616 (citing *Preferred Risk Life Insurance Co. v. Sande*, 421 So.2d 566 (Fla. 5th DCA 1982)).  On this basis, the Court upheld the trial court's definition of manifestation as occurring "[when the deceased either] experienced symptoms of [the disease] or was diagnosed with [the disease] by a physician." 123 So.3d at 607, 615.

### 2. Federal *Engle*-progeny Treatment

When instructing on "manifested," recent federal *Engle*-progeny trial courts have frequently employed differing approaches as to how the jury is to determine when a tobacco-related condition or disease manifested itself.

The instruction in *Deshaies v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-11080, ECF No. 128 (J. Block), seemingly endorsed the *Castleman* approach:

> The critical event is not when the disease was actually diagnosed by a physician, but when Mr. Deshaies knew or should have known that there was a reasonable possibility that his COPD was caused by cigarette smoking.  He knew or should have known of such a possibility if the disease manifested itself in such a way that supplied evidence of a causal relationship.  Experiencing symptoms or effects of a disease is not sufficient evidence unless the symptoms or effects actually disclose a reasonable possibility that the disease was caused by cigarette smoking.

*Accord Griffin v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-11128 (ECF No. 84) (J. Lisi) (same instruction as in *Deshailes*).

Conversely, the Court in *Davis v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-11447, ECF No. 92 (J. Rakoff), in an instruction akin to that in *Ciccone*, stated: "[m]anifested in this sense simply

5

means that [plaintiff] had developed the symptoms of COPD by that date, whether or not she had been diagnosed with it." Similarly, in *Harris v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-13482, ECF No. 141 (J. Sargus), the Court instructed:

> "[M]anifested" in this sense is that point in time when Mr. Harris' oral cavity cancer became symptomatic. This is not necessarily when the exact nature of the disease was diagnosed by a physician after extensive testing, but rather when Mr. Harris' body began to suffer symptoms of the disease, rendering the disease diagnos<u>able</u>.

In summary, other federal judges are as undecided as to the correct definition of "manifestated" as the Florida appellate courts.

### 3. "Manifested" = "Diagnosable"

Where state law leaves a federal court without the requisite guidance that is the basis of the *Erie* doctrine, a federal court must "look at all available data . . . keeping in mind that it must choose the rule which it believes the state court, from all that is known about its methods of reaching decisions is likely in the future to adopt." *Bravo v. U.S.*, 577 F.3d 1324, 1326 (11th Cir. 2009). The lack of any "general trend" in Florida law, due in large part to the novel aspects of the *Engle* litigation, limits me principally to assessing the reasoning in *Castleman* and *Ciccone* in light of the language, policies, and history embedded in *Engle. See id.*

### A. The Unsuitability of the *Castleman* Approach

Turning first to the analysis in *Castleman*, the primary inquiry is whether that Court's treatment of "manifested" as a creature of the statute of limitations has the logical and precedential merit needed for the two concepts to share the same test. *See* 97 So.3d at 877.

I conclude that it does not.

While disease manifestation for *Engle*-class membership purposes is somewhat related to the statute of limitations, in so far as the limitations period works to bar any claim not graced with *Engle*-class status, that is where the tenuous relationship between the two legal constructs ends. "The primary purpose of the statute of limitations is to compel the exercise of a right of action within a reasonable amount of time 'to protect defendants from unfair surprise and stale claims.'" *Ciccone*, 123 So.3d at 612 (quoting *Major League Baseball v. Morsani*, 790 So.2d 1071, 1074-75 (Fla. 2001)). Moreover, in the creeping disease context, knowledge of a causal connection is warranted as a means to prevent the perverse result of plaintiffs being unable to pursue fruitful actions before ever knowing enough to do so. *Frazier*, 89 So.3d at 946.

In contrast, as noted in *Ciccone*, "[c]lass actions typically do not require a class member, during a class membership period, to realize that he has a cause of action." *Ciccone*, 123 So.3d at 613. Class actions, instead, "expand the universe of participating class members beyond known individuals after certification has been granted." *Id.* at 613 (internal citation omitted). This is typically when many putative members first learn about the litigation proceeding on their behalf, know enough to protect their interests, and can assert their claim in common with the other class members.

The Court in *Engle*, conforming to Florida Rule of Civil Procedure 1.220, clarified that the *Engle* class consists of all Florida "citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." 945 So.2d at 1256. In making this ruling, the Court recognized the dangers of an open-ended class, which "would not allow for notice and an opportunity to opt out as required by Rule 1.220(d)(2) and may implicate potential class members' right of access to the

7

courts under article 1, section 21 of the Florida Constitution." *Id.* at 1274-75. Thus, the Court found the plain language of the class notice to support the view that the class "should include only those people who were affected in the past or who were presently suffering," concluding that the reasonable cut-off date for class membership is November 21, 1996. *Id*. at 1275.

In further addressing the specific requirements of the class cut-off date, *Engle* holds that "the critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." *Id*. at 1276. This requirement says nothing about the knowledge of the plaintiff and any causal connection to a potential cause of action. *See id.* Nor should it, as "the unfairness to a plaintiff that informs the knowledge requirement of the statute of limitations cases is absent in this scenario." *See Ciccone*, 123 So.3d at 614.

PMUSA's argument to the contrary – that a notice element would similarly serve as a mechanism for fairness by giving class members requisite information to opt-out – is arguably sound in isolation and as an abstraction, but is without case law support. That contention, as discussed at length *infra*, does not, moreover, fit well into the uniqueness of *Engle*. It would be inappropriate for this Court, sitting in diversity, to bridge the analytical gap and conclude that, as PMUSA argues, it simply "follows" under Florida law that the two constructs properly share the same test merely because of the theoretical benefit from uniform requirements. *See Bravo*, 577 F.3d at 1324-26.

The precedential authority on which *Castleman* relies is likewise unpersuasive. As noted above, the *Castleman* opinion, drawing on *Frazier*, 89 So.2d at 944-45, imports the definition of "manifestation" from the creeping disease limitations context. 97 So. 3d at 877. *Fraizer* had aligned itself with *Engle* in discounting the need for a prior diagnosis as a determinative factor, while adopting the definition of "manifestation" from *Carter v. Brown & Williamson Tobacco Corp.*, 778

8

So.2d 932 (Fla. 2000) (defining accrual for creeping diseases). *See* 89 So.3d at 944-45.  Therefore, in essence, the *Castleman* opinion interprets "manifested" by association – lifting from *Frazier* an analogy meant to support a holding on an analytically distinct issue.  The Court, moreover, accepts *Frazier*'s adopted definition as having been sufficiently imprinted as an interpretation of *Engle*.  *See Castleman*, 97 So.3d at 877.  In doing so, *Castelman* incorrectly "appl[ies] the reasoning in *Frazier*," mixing apples and oranges in adopting a holding that, despite PMUSA's assertion, does not "follow*.*" *See id.*

The opinion in *Castleman*, moreover – and, perhaps, more to the point – fails to address *Engle's* treatment, 945 So.2d at 1276-77, of class representative Angie Della Vecchia.  *See* 97 So.2d at 877.  The *Engle* decision held that Della Vecchia, diagnosed only in February 1997, was nonetheless a qualifying class member.

In finding her class membership to be sufficiently proven, the Court stated that " 'diagnosis' as a qualifying factor does not appear anywhere in the description of the class certified," citing as dispositive her "doctors [noting] in early 1997 that she had a past medical history of 'COPD' and significant hypertension." 945 So.2d at 1276.

Significantly, the Court at no point mentioned or inquired about Della Vecchia's actual or constructive knowledge of a causal connection between smoking and her symptoms and condition. *See id.*  To be sure, as PMUSA notes, the issue of Della Vecchia's notice may not expressly have been before the Court, but the only relevant inquiry that can be gleaned from the Court's analysis is that "medical records indicate[d] that she had been *suffering* from a tobacco-related disease prior to the time of certification." *See id.* (emphasis added).

### B. *Ciccone* Better Accords With *Engle*

Having reviewed "all available data," *Bravo*, 577 F.3d at 1326, I conclude that *Ciccone* appears more likely than *Castleman* to represent what the Florida Supreme Court will declare it meant in *Engle* by "manifested," and, in turn, "suffering." While Florida courts have never specifically defined what "manifested" means, the accepted definition in Florida insurance coverage law, as *Ciccone* noted, centers on symptoms, rather than predicate knowledge or notice. *See id.; Preferred Risk Life Ins. Co. v. Sande*, 421 So.2d 566, 568 (Fla. 5th DCA 1982). "That point in time when the sickness or disease becomes symptomatic" not only reflects biological "suffering," but also offers a practical test that accords with the common sense notion that a disease "manifests" when it becomes diagnosable through evaluation of the patient's "symptoms." *See Ciccone*, 123 So.3d at 615 (citing *Preferred Risk*, 421 So.2d at 568) (emphasis added); *see also American Sun Life Ins. Co. v. Remig*, 482 So.2d 435, 436 (Fla. 5th DCA 1985); *cf.* BLACK'S LAW DICTIONARY 484 (8th ed. 2004) (defining "diagnosis" as "[t]he determination of a medical condition (such as a disease) by physical examination or by study of its symptoms.").

Requiring ex-post proof that plaintiffs knew or should have known that their symptoms were potentially attributable to their smoking vastly complicates the creation of a well-defined, finite class – something the Florida Supreme Court clearly wanted to accomplish in *Engle*. *See* 945 So.2d at 1274-76. This is so, because such a requirement would ultimately depend on the sophistication of the treating physician or the patient, requiring "an inquiry into abstraction of what a plaintiff knew or should have known ten years earlier." *Ciccone*, 123 So.3d at 613-14. What's more, the near endless list of *Engle* diseases and conditions dubbed as smoking-related compounds the bewildering nature of such an inquiry. *See* 945 So.2d at 1276-77.

10

Pragmatism calls for a much simpler inquiry into "suffering," which implies far more than observable characteristics that lend themselves to, what in most cases would be lay identification of creeping diseases and their smoking-related nature. *See Ciccone*, 123 So.3d at 614-15 (affirming the trial court's instruction that the plaintiff could meet their burden "only through expert testimony, and could not rely 'just in general [on] any symptomology that some layman could take to be one aliment or another.' "). As *Ciccone* concludes, class membership could then be "viewed with the benefit of hindsight from the vantage point of 2006," with manifestation being a "question of fact for the jury to be decided with the assistance of expert testimony." *Id*. at 613, 615.

Such an approach also conforms to ordinary principles of language construction. While *Engle* is a judicial pronouncement, it has, at least in the *Engle*-progeny universe, assumed quasi statutory stature and significance. *See Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 431-32, 436 (Fla. 2013), *cert. denied*, 134 S. Ct. 332 (2013)(affirming *Engle's* common liability findings and discussing the specialized process by which *Engle*-progeny plaintiffs must prove their claims); *see also Davis*, No. 3:09-cv-11147, 2014 WL 2885964, ECF No. 93 (noting that *Engle's* legal definition of the *Engle* class was a determination of law analogous to a statutory text or judicial judgment).

The purpose of textual construction in a statutory context is to give effect to legislative intent, accomplished by first looking at the actual language in the text. *Joshua v. City of Gainesville*, 768 So.2d 432, 435 (Fla. 2000). If the statutory language is unclear, the court applies rules of construction and explores the historical context to determine legislative intent. *Id*.; *Weber v. Dobbins*, 616 So.2d 956, 958 (Fla. 1993). I must consider the statute (in this instance, the *Engle* opinion) as a whole, and juxtapose the evil to be corrected with the history of the adoption of the text under review. *Bautista v. State*, 863 So.2d 1180, 1185 (Fla. 2003).

The Court in *Engle* wanted to avoid creating an open-ended, ambiguously defined class. *See* 945 So. 2d at 1274-75. Accordingly, the most reasonable interpretation of the Court's intent is that it sought to fashion a workable and pragmatic way to accommodate that concern. *See id.* One approach that it clearly did not take, as Mrs. Berger asserts, was to require "accrual" or "knew or should have known." Not having used either of these terms in the first instance, it is unlikely that the Court meant to use "manifested" as a more vague synonym for those more precise, commonplace, and restrictive limitations terms.

PMUSA's contention – that the language and reasoning surrounding this omission should be construed as necessarily implying a notice element – is unfounded. From the limited precedent available, I cannot conclude that the Florida Supreme Court, under the unique circumstances of *Engle*, would intend to require a notice element based on a right to opt-out of a class action, yet in the same penstroke determine that "continued class action treatment is not feasible" and decertify the class. *See id.* at 1277. Doing so would serve none of the purposes traditionally associated with the right to opt-out.

PMUSA's broad assertion to the contrary, that the *Ciccone* standard violates due process rights, is inapposite. The *Ciccone* standard leaves unthreatened such core interests as autonomy of action, the individual's interest in his or her "day in court," the freedom to choose and direct one's own counsel, as well as interests at risk from binding settlements, voluntary dismissals, or other compromises. *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, (1985); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, (1950); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507-08 (5th Cir. 1981); *see also* 7AA C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1786 (3d ed. 2014).

This is so, because all *Engle*-progeny plaintiffs must bring their own individual claims. *See* 945 So.2d at 1277 (extending "res judicata effect [to] any subsequent trial between individual class members and the defendants, provided such action is filed within one year of the mandate."). In the unique context of *Engle*, an "unselfconscious" individual, *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 628 (1997), is one who will simply miss the proverbial *Engle* boat, still able to bring an ordinary personal injury action on claims that, due to his lack of notice, have in all probability yet to accrue. *See, e.g.*, *Carter*, 778 So.2d at 934. Therefore, looking directly to the purpose and intent of the *Engle* Court at the time of that landmark opinion, I seriously doubt that the Court would intend to construct a higher standard based largely on a right to opt-out, which itself presupposes that a certified class, from which to opt-out, exists.

The sequence and progression of the analysis in *Engle* also belies PMUSA's assertion that *Ciccone* ignores *Engle's* holding that a class cut-off is essential because "an open-ended class would not allow for notice and an opportunity to opt-out." *See* 945 So.2d at 1274-76. The *Engle* opinion states this proposition in support of its holding that a finite class must exist and that November 21, 1996, was the proper cut-off date. *Id.* at 1274-75.

The Court's analysis appears to be retrospective in the sense that it seeks to step into the shoes of the *Engle* trial court solely to identify temporal limitations for the class. *See id.* at 1274-76. The Court begins its analysis by addressing how "[t]he final class description could lead one to believe that the class is open-ended because there is no stated cut-off date for membership," eventually concluding that "[t]he plain language of the class certification indicates that the trial court anticipated that the class would be cut off or limited to the date of final certification." *Id.* at 1274-75 (citing federal case law discussing class action certification timing). The opinion then moves on to apply

13

this date to the medical histories of several putative class members. *Id*. *Engle's* appeal to the importance of opt-out rights is therefore best described as dicta directed at the trial court's intention to draw a finite class, complete with a cut-off date. *See id.* at 1274-76.

Accordingly, I believe the instruction on "manifestation" that I gave represented a workable standard that, as implied by *Engle*, sought to get as close on the spectrum as possible to the biological genesis of the disease at issue. *See id.* The *Ciccone* approach best accomplished this goal. *See* 123 So.3d at 615.

## CONCLUSION

For the foregoing reasons, I included a *Ciccone*-based definition of "manifestation" in my initial and final jury instructions. That instruction was:

> The first factual determination you must make is whether Mrs. Berger's COPD manifested on or before November 21, 1996. "Manifested" in this sense is that point in time when Mrs. Berger's COPD became symptomatic. This is not necessarily when the exact nature of the disease was diagnosed by a physician after extensive testing, but rather when Mrs. Berger's body began to suffer symptoms of the disease, rendering the disease diagnos<u>able</u>.

I herewith explain and confirm my reasons for having done so.

It is, accordingly, hereby

**ORDERED THAT**, for the reasons stated herein, I declined to give the defendant's proposed instruction on "manifested," and gave an instruction based on *R.J. Reynolds Tobacco Co. v. Ciccone*, 123 So.3d 604 (Fla. 4th DCA 2013).

**So ordered.**

    /s/ James G. Carr
    Sr. U.S. District Judge, N.D. Ohio
    (Sitting by Designation)