# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

Judith Berger,

        Plaintiff,                              Case No. 3:09-cv-14157

        v.                                     **ORDER**

Philip Morris USA, Inc.

        Defendant.

Carr, D.J.[1]

    This is an "*Engle*-progeny"[2] suit by Plaintiff Judith Berger (Mrs. Berger), a former

smoker of cigarettes, against the manufacturer of those cigarettes, Defendant Philip Morris USA,

Inc. (PMUSA).  Following trial, the jury returned a compensatory damages verdict of $6.25

million (with a 40% comparative fault finding) and an award of $20,000,760.14 in punitive

damages based upon Mrs. Berger's fraud and conspiracy claims.  (Doc. 92).

---

[1] Senior U.S. District Judge, N.D. Ohio, sitting by designation.

[2] I refer to the cases filed pursuant to the Florida Supreme Court's opinion in *Engle v. Liggett Group, Inc.* (*Engle III*), 945 So. 2d 1246 (Fla. 2006), as "*Engle*-progeny cases."  There, the Court decertified a statewide class of smokers and their survivors, but allowed members of the decertified class one year in which to file individual lawsuits, referred to as "the *Engle* savings period." *Id. at* 1277.  For a detailed history of the *Engle* litigation, *see Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1326-29 (11th Cir. 2010) and *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011).  I presume the reader's familiarity with the *Engle*-progeny litigation.

Pending is PMUSA's Renewed Motion for Judgment as a Matter of Law on Plaintiff's Fraudulent Concealment and Conspiracy Claims or, in the Alternative, Motion for New Trial and Incorporated Memorandum of Law (Doc. 136), to which Mrs. Berger responded (Doc. 147) and PMUSA replied.  (Doc. 149).  PMUSA additionally filed supplemental authority in support of its motion (Doc. 153), and also requested leave to submit supplemental briefing.  (Doc. 154).

For the reasons that follow, I grant PMUSA's motion (Doc. 136) and enter judgment as a matter of law in favor of PMUSA and against Mrs. Berger as to Mrs. Berger's fraudulent concealment and conspiracy to fraudulently conceal claims.

## I.  Background

Mrs. Berger began smoking in the late 1950s around age thirteen or fourteen.  She started because school friends encouraged her to do so, and she "didn't want to be the only one not to do it."[3]  Her twin sister also began to smoke at about the same time. When asked whether peer pressure was the only reason Mrs. Berger started smoking, Mrs. Berger replied: "Yeah. I would say yes."  According to Mrs. Berger, it was her friend, Anita Russo, who gave her the first cigarette.  Russo, on seeing that Mrs. Berger was not inhaling, as everyone else was, convinced her to start inhaling as she smoked.  Mrs. Berger recalled:

> Q.      And, in fact, you blame Anita Russo, somewhat, for your decision to start smoking; correct?
>
> A.      I blame her for teaching me. I was quite happy just puffing it out.
>
> Q.      Okay. You blame her for teaching you how to inhale?

---

[3] Mrs. Berger testified that students would smoke outside at school, in a "hangout called Cozy's Corner."

A.      Inhale, right.

Q.      And Mrs. Berger, if Anita Russo hadn't taught you how to inhale that smoke, you

believe that you would have ended up like your sister Ann, hating smoking; right?

A.      I think so.

Mrs. Berger was smoking daily by age sixteen, and by the time she turned twenty, she was

smoking a pack and a half per day.

Beginning when and as she did, as a young and impressionable teenager induced by

friends, the evidence at trial showed Mrs. Berger to be entirely typical of those whom tobacco

companies deliberately targeted as prospective customers.  Tobacco companies knew they needed

to gain new customers when they were young, as those who were non-smokers by their twenties

would, in all likelihood, never become their customers.  Tobacco companies consequently

deliberately targeted persons of school and college age to begin smoking, knowing that, as a

result of the addictive powers of their product, and the oft irresistible influence of peer pressure

on pupils and students, they would acquire new, life-long consumers of their products.[4]

Though Mrs. Berger tried to stop a couple of times during her lifetime, she was

unsuccessful until her twin sister became fatally ill from congestive obstructive pulmonary

disease (COPD).  Nursing her sister, from whom Mrs. Berger had only been separated for any

period of time during her honeymoon, while her sister suffered the agonies of dying from the

condition brought an end to Mrs. Berger's smoking in 1988.  By then, Mrs. Berger had smoked

---

[4] Most of those new customers could not and did not know, of course, that they would be
reducing their life expectancy, on average, by ten years, and, in any event, exposing themselves to
a host of incapacitating and deadly cigarette-caused diseases.  By the 1950s and 1960s the tobacco
companies joined and often collusively acted to conceal those consequences, despite their own
knowledge of the addictive and deadly effects of their products.

cigarettes for just short of forty years, having smoked Marlboros and Parliaments for twenty-five of those years.

By the '90s, however, Mrs. Berger experienced the symptoms of COPD.  Her condition has taken the predictable course.  At trial, she was wheelchair bound and tethered to an oxygen tank.  Her life expectancy was estimated at trial to be three to five years.

At issue now is the sufficiency of the evidence to sustain Mrs. Berger's fraudulent concealment and conspiracy to fraudulently conceal claims; specifically, whether sufficient evidence exists as to Mrs. Berger's detrimental reliance on the fraudulent conduct in which PMUSA and its tobacco company cohorts jointly engaged for decades before finally acknowledging that nicotine is addictive and that smoking causes various diseases, including COPD.

In summary, the evidence at trial persuasively showed that that fraudulent conduct involved, *inter alia*:

- Concealing from both the public and scientific community the knowledge that PMUSA and its co-conspirator tobacco companies had that:

  - Nicotine was addictive;

  - Cigarettes containing nicotine caused fatal disease, including lung diseases;

  - Filter tip cigarettes were more addictive and more hazardous than non-filter tip cigarettes;

- On publication of the Surgeon General's Report of 1964 and for an extended period of time thereafter, deliberately and knowingly making materially false statements (and doing so jointly and collusively with the other tobacco companies) intended to encourage people to smoke, and to continue smoking, and expecting and intending that those false statements would allay fears and increase cigarette consumption, and thus tobacco company profits, that:

4

- Debunked, discredited, denied, downplayed, and cast doubt on the accuracy and integrity of the authors of and underlying research supporting the Surgeon General's Report and subsequent Reports and warnings about the health hazards of smoking, and, in general, seeking to defame, undercut, and marginalize the work of the Surgeon General and other organizations, such as the American Cancer Society, that sought to increase public awareness about the deleterious and deadly consequences of smoking;

- Presented, along with its tobacco company co-conspirators, perjurious testimony to Congress;

- The scientific evidence as to whether nicotine was addictive was inconclusive;

- Experts disagreed as to the addictive properties of nicotine;

- The scientific evidence as to the health hazards of smoking were inconclusive;

- Experts disagreed as to the health hazards of smoking;

- Engaging in a protracted public campaign that included, *inter alia*, saturation advertising and broadcast interviews with tobacco company spokesmen/apologists intended to communicate and appear to confirm the truthfulness of the above-noted materially false, deceptive, and misleading statements;

- Deliberately using false and deceptive multi-media saturation advertising to cause smokers concerned about the risks of smoking to switch to filter tip cigarettes and 'light' products because they were less harmful to health than traditional cigarettes; doing so knowing that such "more healthful" products were, in fact, more addictive and dangerous than unfiltered cigarettes.

In light of the foregoing, there was ample evidence that the tobacco companies engaged in a massive, multi-faceted, protracted, and effective disinformation campaign. Mrs. Berger's counsel aptly demonstrated the effect of that campaign in his closing argument, to wit: "[W]hat we've got here and what Philip Morris and this industry is doing is worse because there's the

truck driver, foot on the gas, about to go, looks out the window at the guy about to cross the street and goes, come on, come on; that's the conduct we have."

Proof of the foregoing fraudulent conduct and its likely impact on the tobacco companies' targets, as extensive as it was, is not, however, enough, standing alone, to uphold the jury's finding in this or any other *Engle*-progeny case.  Mrs. Berger had to prove that she relied on what the tobacco companies were saying and doing, by both affirmation and concealment, as she began and/or continued to smoke.

Mrs. Berger's testimony clearly indicates that she was not insulated from or oblivious to the tobacco companies' disinformation.  Her testimony shows that she was cognizant of representations made and messages broadcast by PMUSA and other tobacco companies.  For example:

- She answered "[y]es" when asked whether she remembered cigarette advertising, and testified to seeing billboards, advertisements in trains, on buses, and on TV as a youth and/or in high school;

- She remembered the Marlboro Man as "a good looking guy on a horse smoking," portraying the image "[t]hat [smoking] wasn't bad. . .it was okay";

- She recalled famous people smoking, including "[m]ostly all" movie stars;

- When asked whether she knew the health hazards of cigarette smoking at age 16 in 1960, she replied: "[n]o. They were smoking in the movies, restaurants. No."  It was, as she recalled: "like nothing. . . like having a hamburger or -- I don't know how to explain it. We took it for granted. It was nothing.";

- When asked about what she thought of warnings placed on cigarette packages in 1966, she answered "I thought they weren't sure at the time. . .they were speculating." She recalled many of her friends sharing the same impression with her, further noting: "At that date and time, I don't think anybody [took the warnings seriously]. . .[t]hey were working on it, but it wasn't a sure thing yet.";

- When asked if she knew smoking cigarettes was hazardous to her health in 1966, she responded: "[not] with 100 percent, no.";

- She also confirmed previous testimony that "[she] kind of figured [smoking was hazardous to her health]. . . kind of knew," adding: "I wanted to believe what the Surgeon General would say, but I didn't take it seriously enough. I knew a lot of people that smoked and they were in their 90s."

Like many other smokers whom the disinformation campaign targeted, Mrs. Berger decided to switch, at her sister's suggestion, from unfiltered Marlboros to a filtered brand, Parliament Lights (another PMUSA product). When asked why she did so, Mrs. Berger testified that she thought the filtered cigarette tasted better. She also enjoyed the recessed filter feature, which she recalled seeing advertised.

Mrs. Berger further explained that she switched to filtered cigarettes to keep loose pieces of tobacco out of her mouth. She did not like the taste of tobacco and having to spit out pieces. She also testified that she preferred the feel of the filter tip cigarette in her mouth. She had found smoking unfiltered cigarettes to be "kind of unpleasant."

When asked whether any other reason existed behind her switching to filtered cigarettes, she answered: "No reason . . . just didn't like the unfiltered ones."

Mrs. Berger was also asked what caused her to prefer the "light" brand. Her answers to that line of questions are crucial:

Q.   You told us on direct examination today in your testimony that there was some point you switched to light cigarettes; is that correct?

A.   Right.

Q.   And the reason you switched to light cigarettes is because you liked the taste of those cigarettes better; correct?

A.   They weren't as harsh.

Q.   They weren't as strong or harsh; correct?

A.      Right, correct.

Q.      And there's no other reason that you chose to smoke a light cigarette; correct?

A.      Just that reason.

Q.      You did not choose to smoke a light cigarette because you thought they were better for your health; correct?

A.      Correct.

Q.      And you didn't choose to smoke the Parliament cigarettes because you thought they were better for your health; correct?

A.      Correct. No, to me they were all the same.

Mrs. Berger acknowledged that she had enjoyed the taste of cigarettes, enjoyed smoking with a cup of coffee, and enjoyed the social aspect of smoking.  During the occasional periods when she tried to quit, she would feel outcast because all her friends smoked.  When asked whether she thought cigarettes helped her relax, she responded "I guess I did."

Mrs. Berger gave no testimony that suggested that the false and fraudulent disinformation campaign, as manifest in the saturation advertising, influenced her decision to switch from an unfiltered brand or to try to stop smoking:

Q.      And the fact is, Mrs. Berger, that you never bought or chose a particular brand of cigarette because of an advertisement; right?

A.      No.

Q.      Am I correct?

A.      You're correct.

She testified that the only influence from advertising on her decision to switch to Parliament Lights was the assertion that they were less harsh.

8

With regard to the disinformation, as reported in the media, Mrs. Berger testified that she never saw or heard a tobacco representative discuss or dispute the health risks of smoking in the 1950s, '60s, '70s, '80s or '90s.  She testified to having been unfamiliar with the industry's false efforts to put a respectable front on its disinformation campaign via such false flag entities as the Tobacco Industry Research Committee, the Council for Tobacco Research, and the Tobacco Institute.  She acknowledged that she never directly communicated with a tobacco representative. Nor had she ever read anything in the newspapers reporting cigarette smoking was not hazardous to health.

The only concerns about the health risks of smoking she recalled were her mother's mention that she had read in a newspaper that the Surgeon General intended to place warnings on cigarette packages.  Mrs. Berger's response to those warnings at the time, as already noted, was that she thought they were speculative.

When Mrs. Berger completed her case, PMUSA timely moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law as to Mrs. Berger's fraud and conspiracy claims.  (Doc 86). I denied the motion, without prejudice to PMUSA's right to renew.  (Doc. 130).  The jury subsequently returned the verdict noted above and I entered judgment accordingly.  (Doc. 131). Thereafter PMUSA timely renewed its motion, which I now grant.

## II.  Standard

The standard for granting a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is the same as the standard for granting the pre-submission motion under Rule 50(a).  *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007) (citing 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (2d ed.1995)).  Under

that standard, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Id.* A court "should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004). "The issue is not whether the evidence was sufficient for [the losing party] to have won, but whether the evidence was sufficient for it to have lost." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1265 (11th Cir. 2008).

While I review all evidence of record, I am to draw all reasonable inferences in favor of the nonmoving party. I "must disregard all evidence favorable to the moving party that the jury is not required to believe. . .[giving] credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Products, Inc*, 530 U.S. 133, 150-51 (internal citation and quotations omitted).

Moreover, I may not make credibility determinations or weigh the evidence. *Id.* at 150; *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1560 (11th Cir. 1995). "The line of demarcation which [I am] required to walk is ephemeral: [I] must conclude that an inference is unreasonable without falling into the trap of weighing all the evidence." *Helene Curtis Indus., Inc. v. Pruitt*, 385 F.2d 841, 851 (5th Cir. 1967); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). "The standard for determining whether an inference is allowable is generally whether it is a reasonable one, that is, whether it is one that 'reasonable and fair-minded men in the exercise of impartial judgment' might draw from the evidence." *Daniels*, *supra*, 692 F.2d at 1326 (citation omitted). Ultimately, I am to leave the jury's verdict intact "if

there is evidence from which [the jury]. . .reasonably could have resolved the matter the way it did." *Rodriguez*, 518 F.3d at 1264.

### III.  Discussion

### A. Standard for Determining the Adequacy of the Evidence as to Plaintiff's Reliance on Defendant's Fraudulent Conduct

The dispositive issue before me is whether Mrs. Berger produced sufficient evidence to sustain the jury's finding that she relied on the tobacco companies' conspiratorially engendered fraudulent misrepresentations and misleading failure to disclose known and material facts about the addictive nature and health hazards of somking.

Florida law is clear that an *Engle*-progeny claimant must establish detrimental reliance to prevail on fraudulent concealment and conspiracy to fraudulently conceal claims.  *E.g.*, *Hess v. Philip Morris USA*, *Inc*., 2015 WL 1472319, *8 (Fla. 2015) (subject to revision or withdrawal) ("*Engle*-progeny plaintiffs must certainly prove detrimental reliance in order to prevail on their fraudulent concealment claims.")*;Philip Morris USA, Inc. v. Russo,* 2015 WL 1472282, *4 (Fla. 2015) (subject to revision or withdrawal); *Philip Morris USA, Inc. v. Douglas* (*Douglas*), 110 So. 3d 419, 428 (Fla. 2013) *cert. denied*, 134 S. Ct. 332 (2013) (referring to *Engle III*'s reference to individual questions of reliance and legal cause);  *Engle III*, 945 So. 2d at 1263, 1276-77 ("In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct.")*; Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 947 (Fla. App. 2012).  Accordingly, I instructed the jury that, to prevail on her fraudulent concealment claim, Mrs. Berger had to prove "[s]he relied to her detriment on the incomplete representations the defendant in fact was making

about the health effects and/or addictive nature of smoking cigarettes. . .[and] her reliance on the incomplete representations. . . was a legal cause of her COPD."[5]  (Doc. 94).

In support of her contention that her proof sufficed, Mrs. Berger relies on the First District Court of Appeal's 2010 decision, *R.J. Reynolds Tobacco Co. v. Martin*,  53 So. 3d 1060 (Fla. App. 2010).  In *Martin*, the court upheld a progeny-plaintiff's fraudulent concealment claim without any "direct evidence showing [plaintiff] relied on information put out by the tobacco companies omitting scientific findings on the harmful effects of smoking." *Id.* at 1069-70.  The court reasoned that the record contained abundant evidence from which the jury could infer plaintiff's reliance on pervasive advertising campaigns and on the "false controversy" created by tobacco during the years in question.  *Id.*; *accord R.J. Reynolds Tobacco Co. v. Webb*.  93 So. 3d 331, 333 (Fla. App. 2012).

Other Districts have incorporated the reasoning in *Martin* into subsequent decisions.  In *Philip Morris USA, Inc. v. Hallgren,* 124 So. 3d 350, 353 (Fla. App. 2013), the Second District Court of Appeals, in addition to finding sufficient direct evidence of reliance, upheld a verdict on the basis of "the inference of reliance" permitted by *Martin*.  The Fourth District Court of Appeal cited *Martin* with approval in *Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 947 (Fla. App. 2012), for a similar purpose.  Indeed, one District Judge in a federal *Engle*-progeny case referred to *Martin* as "good law."  *Searcy v. R.J. Reynolds Tobacco Co.*, 2013 WL 4928230, *4 (M.D. Fla.).

---

[5] I also instructed the jury that, on her claim of conspiracy to fraudulently conceal, Mrs. Berger had to prove she "relied to her detriment on a statement(s) made or an act(s) done by the defendant, or someone for whose conduct the defendant was responsible. . .done in furtherance of an agreement to conceal or omit material information from its representations. . .[and that] [h]er reliance was a legal cause of Mrs. Berger's COPD ."  (Doc. 94).

Unfortunately for Mrs. Berger, the decision in *Martin* does not control my review under Fed. R. Civ. P. 50(b). This is so because, even when sitting in diversity, I am to apply the federal sufficiency of evidence standard. As the predecessor Fifth Circuit stated in *King v. Ford Motor Co.*, "[i]n diversity cases in this circuit, a district court applies the federal, rather than the state, standard for determining whether a party's evidence is sufficient." 597 F.2d 436, 439 (5th Cir.1979). The Eleventh Circuit has not deviated from this precedent. *See Daniels, supra,* 692 F.2d at 1326 (discussing the modern approach of applying a federal standard to the sufficiency of evidence in diversity cases)*; see also Jones v. Miles Labs., Inc.*, 887 F.2d 1576, 1578 (11th Cir. 1989)(negligence action; Georgia law)*; Miles v. Tennessee River Pulp & Paper Co.*, 862 F.2d 1525, 1528 (11th Cir. 1989) (fraud; Alabama law); *Fed. Kemper Life Assur. Co. v. First Nat. Bank of Birmingham*, 712 F.2d 459, 464 (11th Cir. 1983) (issue relating to increased risk of loss; Alabama law); *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) *rev'd on other grounds Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc). PMUSA correctly asserts that the application of *Martin* in this manner, at its core, would constitute improper importation of a procedural rule concerning the sufficiency of evidence.[6] *See Daniels, supra,* 692 F.2d at 1323; *Prickett v. United States*, 111 F. Supp. 2d 1191, 1196-97 n.3 (M.D. Ala. 2000), *aff'd*, 268 F.3d 1066 (11th Cir. 2001) ("Alabama's rule against pyramiding inferences

---

[6] As the Fifth Circuit noted in *Shipman*, *supra*, 411 F.2d at 374–75 (emphasis added), motions for directed verdict and judgment n.o.v. ought not "be granted *only* when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question." An adherence to *Martin*, if construed as Mrs. Berger submits, would require the denial of such a motion less there be a complete absence of probative facts presented at trial.

concerns the sufficiency of the evidence, is procedural and not substantive, and, therefore, is supplanted by federal law.") (citations omitted)).

Furthermore, even if *Martin* applied as Mrs. Berger contends,[7] it may conflict with the doctrines controlling *Engle*-progeny trials.  As the Florida Supreme Court held in *Engle III*, and then confirmed in *Douglas,* courts must try matters *individual* to each claimant *individually*. *Douglas, supra*,110 So. 3d at 428, 430 ("[In *Engle III*] this Court 'unanimously agree[d] that the *nonspecific* findings in favor of the plaintiffs on. . .fraud and misrepresentation. . .are inadequate to allow a subsequent jury to consider *individual questions of reliance and legal cause*.'"); *Engle III*, 945 So. 2d at 1254-55, 1263, 1270-71 (approving the *Engle* trial plan while

_____

[7] While unfamiliar with the trial record in *Martin*, I am not convinced *Martin* itself intended to stand for the proposition advanced by Mrs. Berger.  As noted in *Searcy, supra,* 2013 WL 4928230, *4 (emphasis added), *Martin*

> rejected the [ ] defendant's argument that plaintiff failed to prove the reliance element of her fraudulent concealment claim because she put on no *direct* evidence showing decedent relied on information put out by the tobacco companies omitting scientific findings on the harmful effects of smoking.

Rather, *Martin* appears to stand for a pledge of allegiance to the power of properly applied, rational, circumstantial evidence.  Indeed, one of the two cases cited by *Martin* in its holding, *Bullock v. Philip Morris USA, Inc.*, stressed the importance of plaintiff not being required to *directly* prove reliance.  *See* 159 Cal. App. 4th 655, 676 (2008).  Another example comes from *Hallgren, supra*, 124 So. 3d 350, 353 (Fla. App. 2013), which cites *Martin*'s "inference of reliance" as an alternative to "direct" evidence presented at trial. . ."  An important distinction exists, though, between drawing inferences from strong circumstantial evidence and drawing speculative inferences from purely generic evidence in the face of contradicting evidence offered by the claimant.  Additionally, as PMUSA contends, the interpretation championed by Mrs. Berger appears to be fundamentally at odds with other related Florida case law.  *See, e.g., Humana, Inc. v. Castillo*, 728 So. 2d 261, 265 (Fla. App. 1999) ("Florida law imposes a reliance requirement in an omissions case, which cannot be satisfied by assumptions."); *Engle II*, 853 So. 2d at 446 n.10 (rejecting the notion of presumed reliance as contrary to Florida law); *see also Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.*, 881 So. 2d 565, 573 (Fla. App. 2004); *Morgan v. W.R. Grace & Co.--Conn.*, 779 So. 2d 503, 506 (Fla. App. 2000); *Morgan v. Canaveral Port Auth.*, 202 So. 2d 884, 887 (Fla. App. 1967).

14

discussing the importance of individualized determinations of issues, such as reliance and legal

cause, not commonly shared by class members).

This principle of individualized adjudication is the foundation on which *Engle*-progeny

trials stand.  It is a structure the *Douglas* court recognized to be not only the most accurate

expression of *Engle III*, but also as one that provided necessary procedural safeguards against the

arbitrary deprivation of property – namely, the *Engle* defendants' ability to defend the remaining

elements of each progeny-plaintiff's *prima facie* case.  *See Douglas, supra*, 110 So. 3d at 428,

435-36 (discussing *Engle III*'s intention for specific causation to be determined individually

while rejecting due process challenges); *see also Harris v. R.J. Reynolds Tobacco Co.*, 2014 WL

7339211, *4 (M.D. Fla.).  To allow a finding of detrimental reliance to necessarily follow from

nothing more than generic evidence of PMUSA's general conduct would be to deny the very

essence of *Engle III* and *Douglas*.[8]

In light of *Engle III* and *Douglas*, it appears likely that, if given the opportunity, the

Florida Supreme Court would elect not to follow *Martin* to the extent proposed by Mrs. Berger.

Though the crystal ball is always cloudy when a federal court seeks to discern the future course

that state jurisprudence will take through a dimly charted realm, I am persuaded that that Court

would opt for requiring some proof of individualized reliance on the tobacco companies'

fraudulent misconduct.  *Cf. Baker v. R.J. Reynolds Tobacco Co.*, 2015 WL 671192, *6 (Fla.

App.) (discussing the *Martin* decision, while noting that whether *Engle*-progeny plaintiffs were

---

[8] Such an approach would seriously alter an *Engle*-progeny plaintiff's burden at trial. At a
minimum, it would shift the quantum of proof required to prevail on the subject causes of action,
and, at worst, eviscerate the plaintiff's burden altogether.  It would also, at the same time, damage
an *Engle* defendant's ability to defend against those remaining elements of plaintiff's claims.

required to prove more than mere class membership and damages was an unsettled area of law

prior to *Douglas*); *R.J. Reynolds Tobacco Co. v. Brown*, 70 So. 3d 707, 714 (Fla. App. 2011)

("From a jurisprudence standpoint, the issue of how to apply the Engle findings is in its

infancy.").  That being so, I may, and properly should disregard an opinion of a an intermediate

state court if persuaded, as I am here, that the state's highest court would reach a different result.

*See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011)

(discussing a federal court's power to disregard intermediate appellate court decisions if

persuasive evidence demonstrates that the state's highest court would conclude otherwise); *Bravo

v. United States*, 577 F.3d 1324, 1326 (11th Cir. 2009) (citing *King v. Order of United

Commercial Travelers of Am.*, 333 U.S. 153, 157-158 (1948)) (same)).

In any event, I conclude that *Martin* does not properly state the appropriate standard as to

the proof of Mrs. Berger's alleged detrimental reliance.

The evidence at trial amply confirmed the tobacco companies' decades-long fraudulent

conduct–fraudulent conduct in which PMUSA was actively and deeply complicit.  But that

evidence alone, without an additional link to Mrs. Berger's individual detrimental reliance, is not

enough to sustain her fraud and conspiracy claims.  The jury cannot sanction PMUSA simply

because of the wrongfulness of its conduct, no matter how frightfully inhumane, vile, and

unconscionable – Mrs. Berger must prove that *she* has cause to recover because PMUSA's

conduct helped lure her to begin and/or continue smoking despite the jeopardy into which she

placed herself.[9]  That is the meaning and mandate of *Engle III* and *Douglas*.

---

[9] As noted above, in his closing argument, Mrs. Berger's counsel powerfully illustrated
PMUSA's conduct.  Bending forward and gesturing, he compared that conduct to a truck driver, foot
on the gas, beckoning to a pedestrian, and thereby telling her to "come on, come on," cross on over,

## B. The Plaintiff's Evidence Failed to Establish
## Detrimental Reliance on the Fraudulent Conduct

While the evidence of PMUSA's fraudulent misconduct was extensive, evidence as to whether that fraudulent conduct had any impact on Mrs. Berger was not.[10]  Only one of Mrs. Berger's several expert witnesses, Dr. Neil Grunberg, an expert on addiction and past tobacco company conduct, testified with any degree of focus on the history of Mrs. Berger's smoking behavior.  In forming his opinions, Dr. Grunberg testified to having reviewed Mrs. Berger's files and her husband's depositions, as well as to having spoken with her personally.  His testimony fell into one of two categories: 1) generic testimony that, at most, relates to Mrs. Berger by inference of association, and 2) his specific testimony directly relating to Mrs. Berger.

Dr. Grunberg's more generic testimony covered a broad range of topics.  He testified about tobacco companies' decades-long withholding of scientifically valid evidence regarding nicotine addiction and cigarette structure, the potentially positive impact that evidence would

───────────────

knowing that he was about to run her down when she did so.  Proof of that sort of devious and malicious conduct is, though not enough – the deliberately injured pedestrian must still show that she saw the beckoning finger, and that it lured her into a mistaken sense that it was safe to start walking, and to keep on walking as the truck was about to run her down.

[10] At trial, the jury found Mrs. Berger to have relied on incomplete representations by PMUSA and on statement(s) made or act(s) done in furtherance of the conspiracy, both before and on or after May 5, 1982.  (Doc. 92).   PMUSA contends that judgment as a matter of law is warranted because Mrs. Berger failed to introduce evidence of her alleged detrimental reliance on PMUSA's fraudulent concealment and conspiracy after May 5, 1982.  During the pendency of this motion, however, the Florida Supreme Court rendered decisions in *Hess v. Philip Morris USA, Inc.*, — So.3d — 2015 WL 1472319 (Fla. 2015) (subject to revision or withdrawal), and *Philip Morris USA, Inc. v. Russo*, — So.3d —, 2015 WL 1472282 (Fla. 2015) (same).  The decisions reject as a matter of law the fraud statute of repose defense in *Engle*-progeny cases and make clear that evidence of reliance need not be established within the fraud statute of repose period.  *Hess*, — So.3d — 2015 WL 1472319, *9; *Russo*, — So.3d — 2015 WL 1472282, *5. In any event, the issue is moot, as I conclude Mrs. Berger failed to present sufficient evidence that she relied to her detriment for any time period material to her case.

have had if the companies had shared their knowledge with scientists, the government, and the public, as well as the consequent delay in development of remedies for nicotine addiction.

Moreover, Dr. Grunberg testified about the social and psychological reasons individuals begin smoking, typically before and sometimes well before they are twenty years old, as well as the blend of biological and psychological reasons that cause individuals to continue to smoke, the effect PMUSA and other companies' actions had on people similar to Mrs. Berger, and the addiction treatments available during Mrs. Berger's lifetime, including those treatments that would have been available but for the withheld research.

With regard to the second category of Dr. Grunberg's testimony, much of which I admitted under Fed. R. Evid. 703 solely for evaluating the reliability of his principal conclusion, Dr. Grunberg testified that Mrs. Berger was heavily biologically addicted to nicotine and described how nicotine inhibited and impaired Mrs. Berger's "free choice" and ability to control her craving for nicotine.  Dr. Grunberg based his opinions, in part, on Mrs. Berger having attributed her decision to smoke to peer pressure and the easy availability of cigarettes.  He further noted Mrs. Berger's testimony about enjoying the taste of a cigarette, the relaxing effect smoking cigarettes had on her, and the pleasure of having cigarettes while drinking at a bar and when drinking coffee.

Dr. Grunberg also based his testimony, in part, on Mrs. Berger's assertions that she never chose a cigarette brand based on an advertisement, had neither seen a cigarette advertisement before she started smoking nor paid any attention thereafter to cigarette advertising, and that she opted for filter tip cigarettes because she did not like tobacco getting in her mouth. He also acknowledged that she had not chosen to smoke light cigarettes due to any concerns about the

effect of smoking on her health; rather, she preferred their flavor and taste.  He further recognized that from the 1950s through the 1990s she had never read, seen, or heard anything about the industry's *faux* "research" entities or company representatives disputing or seeking to negate concerns about smoking-related or caused health risks.  The same was true with regard to the companies' "Frank Statement" to cigarette smokers.  He additionally noted Mrs. Berger's statement that she had not taken warning labels on cigarettes seriously.

Because most of Dr. Grunberg's 'specific' testimony on this matter is not admissible without limitation and thus cannot properly give rise to inferences of reliance, Mrs. Berger's claim of reliance rises or falls on her own testimony.  While the evidence of record, especially the evidence regarding the saturation of cigarette advertising, may raise an inference that Mrs. Berger was cognizant of and subliminally affected by the companies' massive disinformation campaign, only Mrs. Berger, of all the witnesses, possessed personal, intimate knowledge of the extent to which, if any, she detrimentally relied on any portion of that disinformation.  The evidentiary insufficiency brought to light by that testimony – testimony which was remarkably candid and forthright – requires vacation of her subject claims.

I have undertaken above to comprehensively recount Mrs. Berger's testimony with regard to why she began smoking (and inhaling) and how and why, according to her, she continued to smoke until finally stopping upon her sister's death.  The only indication that the companies' pervasive efforts to allay the fears the Surgeon General had engendered came in her response to what she thought of the warnings on cigarette packages beginning in 1966.  In response, she stated, "I thought they weren't sure at the time. . .they were speculating."  Many of her friends shared the same impression with her.  "At that date and time, I don't think anybody [took the

19

warnings seriously]," she testified, further noting that "[t]hey were working on it, but it wasn't a sure thing yet."

Moreover, when directly asked whether she knew smoking cigarettes was hazardous to her health in 1966, she responded: "[not] with 100 percent, no."  Mrs. Berger also confirmed previous testimony that "[she] kind of figured [smoking was hazardous to her health]. . .kind of knew," adding further: "I wanted to believe what the Surgeon General would say, but I didn't take it seriously enough. I knew a lot of people that smoked and they were in their 90s."

While Mrs. Berger's recollections show that she, like most people in that era, was aware of the disinformation tobacco companies were pervasively and successfully spreading, awareness of the fraudulently made statements is not enough.  There must be a link, a nexus between awareness of the lies and acting on those lies.  The evidence in this case did not create that link, much less do so with sufficient strength to overcome Mrs. Berger's own testimony directly disclaiming any such link.

Advertising did not influence her decision to smoke and then inhale: peer pressure did.

After the Surgeon General's 1964 report and cigarette package labeling in 1966, at which point the disinformation campaign went into high gear, Mrs. Berger chose Parliament – which PMUSA's advertising suggested was not harmful, or at least not as much so, as unfiltered cigarettes – but not in response to those falsehoods.  She was completely unaware of the work and proclamations of the *faux* "research" entities and their affiliated spokespersons.  Mrs. Berger instead chose that brand on its actual, rather than illusory qualities – the less harsh taste and to avoid getting bits of tobacco in her mouth. When asked whether any other reason existed behind her switching to filtered cigarettes, she answered: "[n]o reason. . .just didn't like the unfiltered

ones." Concerns about health played no role in her decision to change brands. The advertising that surrounded everyone at that time had no effect on her decision to change from unfiltered to filtered cigarettes – personal preference, not the fraudulent conduct, motived her decision.[11]

In the absence of a Florida case defining "reliance" in this context,[12] I look, in view of the fact that Florida adopted sections of the Restatement (2d) of Torts in *West v. Caterpillar Tractor Co.*, Inc., 336 So.2d 80 (Fla.1976), to the definition of "reliance" as expressed in the Restatement (2d)'s description of "reliance."[13] According to § 548, Comment a[14] (emphasis supplied): "In order to justify recovery, the recipient of a misrepresentation must *rely upon the truth of the misrepresentation itself*, and his reliance upon its truth must be a substantial factor *in inducing him to act or to refrain from action*. . ." Inducement in this context implies action or inaction following from conscious reasoning.[15]

---

[11] As noted above, Mrs. Berger testified that she had enjoyed the taste and relaxing effect of cigarettes, enjoyed smoking with a cup of coffee, enjoyed the social aspect of smoking, and would feel outcast during her attempts to quit because all her friends smoked.

[12] The closest a Florida court appears to have come to defining "reliance" in a commercial setting is *Sanchez v. Crandon Wholesale Drug Co.,* 167 So.2d 640, 641(Fla. App. 1964), *decision quashed on other grounds*, 173 So.2d 687 (Fla. 1965), in which the appellate court stated: "[r]eliance, in the legal sense, means depending on a certain set of facts, then having the facts change to the detriment of the person relying thereon."

[13] I look to the Restatement (2d) as there is some doubt whether Florida will adopt, at least *in toto*, the Restatement of Torts (3d). *See Liggett Group, Inc. v. Davis*, 973 So.2d 467, 473-74 (Fla. App. 2007) (questioning whether Florida Supreme Court will adopt "risk/benefit" doctrine of Restatement of Torts (3d)).

[14] Section 557A concerns "Fraudulent Misrepresentations Causing Physical Harm," and, with exception, incorporates rules from sections 525 to 551. Restatement (Second) of Torts § 557A, Cmt. a (1977).

[15] This, of course, is not to say that a specific incomplete representation, statement, or act must be identified to have directly found its way into a claimant's reasoning, *see Philip Morris USA Inc. v. Putney*, 117 So. 3d 798, 802 (Fla. App. 2013), *reh'g denied* (Aug. 9, 2013); *Philip Morris*

Here, there is but little evidence that Mrs. Berger was aware of the false disinformation and even less evidence that she acted or refrained from action due to it. To be sure, Mrs. Berger thought that the question of smoking's addictive effects and risks to health was uncertain and the basis for the Surgeon General's warnings, which she admitted ignoring, was speculative. This testimony fairly gives rise to an inference that the disinformation affected her smoking-related decisions.

Those inferences are, however, insufficient to support the verdict in light of Mrs. Berger's own explicit testimony. Though she was aware of the Surgeon General's warnings and was under the impression that the science relating to health risks appeared in dispute and uncertain, her testimony failed to connect, and even served to disconnect, her ensuing decisions with the companies' false pronouncements about those issues.

Instead, as detailed above, Mrs. Berger expressly attributed her decision to begin smoking to peer pressure alone.[16] Furthermore, her decisions to use filtered and 'light' cigarettes and to

---

*USA, Inc. v. Kayton*, 104 So. 3d 1145, 1149 (Fla. App. 2012), but, rather, that some evidence must exist that a perception drawn from the totality of the tobacco companies' tapestry of deceit translated into Mrs. Berger's detrimental action or inaction. *See Naugle*, *supra*, 103 So. 3d at 947 (quoting *Castillo, supra,* 728 So.2d at 265 ("If a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiff's misapprehension, the plaintiff cannot recover.").

[16] While detrimental reliance does not require that a representation be made directly to Mrs. Berger, *see Naugle*, *supra*, 103 So. 3d at 947 (quoting *Harrell v. Branson*, 344 So.2d 604, 606 (Fla. App. 1977)) ("[i]t is not necessary that a direct statement be made to the representee in order to give rise to the right to rely upon the statement, for it is immaterial whether it passes through a direct or circuitous channel in reaching him, provided it be made with the intent that it shall reach him and be acted on by the injured party."), the record does not support the proposition that Mrs. Berger relied on incomplete representations, or conspiratorial statements or acts, reaching her through circuitous channels, such as her peers. Mrs. Berger testified that her friends convinced her to smoke her first cigarette, and that everybody smoked, explaining: "I didn't want to be the only one not to do it." She also testified that her friend, Anita Russo, provided her with her first cigarettes and

switch from Marlboro to Parliaments were solely a matter of personal preference based on

comfort (not having to spit out stray bits of tobacco and a more pleasant feeling in her mouth)

and the less harsh taste she found in those cigarette types. Indeed, Mrs. Berger's decision to

smoke 'light' cigarettes was not attributable to healthfulness, because, to her, "they were all the

same." This is strong – indeed, conclusive – evidence that the disinformation campaign played

no role in her decisions as they related to the addictive nature and health effects of smoking.

Therefore, Mrs. Berger's position would require the jury to draw not only an uneasy string of

inferences from her perceptions,[17] but a string of inferences in utter discord with uncontradicted

testimony offered by Mrs. Berger herself. Her own testimony thus overcomes any inference of

reliance that her awareness of the warnings and false 'disputes' and 'uncertainties' might

otherwise raise. As the Fifth Circuit stated in *Helene Curtis Indus., Inc. v. Pruitt*, "an inference

is unreasonable if it is at war with uncontradicted or unimpeached facts."[18] *See supra*, 385 F.2d

---

taught her how to properly inhale. No evidence exists, however, as to why Mrs. Berger's friends, including Anita Russo, smoked. When asked why Anita Russo thought Mrs. Berger was "chicken" for not inhaling, Mrs. Berger responded "I have no idea." And, while Mrs. Berger testified that, at age twenty-two (in 1966), some of her friends shared the impression with her that doubt and speculation existed regarding the package warning – 'Cigarette smoking may be hazardous to your health,' (*i.e.*, "[A] lot of them would tell me: They're not sure of it.") – crucially, nothing of record suggests Mrs. Berger relied on her friends' thoughts on the health effects and/or addictive nature of smoking. Therefore, Mrs. Berger's contention that sufficient evidence existed for the jury to infer reliance on fraudulent conduct channeled through her peers is without merit. *See Daniels*, *supra*, 692 F.2d at 1326 ("[A] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. . .[s]uch an inference is infirm.").

[17] Under federal law, nothing precludes jurors from pyramiding inferences so long as the inference relied upon is reasonable under federal standards. *See Daniels*, *supra*, 692 F.2d at 1324; *Equitable Life Assur. Soc. of U.S. v. Fry*, 386 F.2d 239, 245 (5th Cir. 1967).

[18] Florida law is similar in this regard. *See Child v. Child*, 474 So. 299, 301 (Fla. App. 1985) (contrary and conclusive direct evidence overcomes circumstantial evidence) *review denied*, 484 So.2d 7 (Fla.1986); *Alan & Alan, Inc. v. Gulfstream Car Wash, Inc.*, 385 So. 2d 121, 123 (Fla.

at 851; *Daniels*, *supra*, 692 F.2d at 1326-28; *Fenner v. Gen. Motors Corp.*, 657 F.2d 647, 651

(5th Cir. 1981); *Shipman*, *supra*, 411 F.2d at 374–75 ("There must be a conflict in substantial

evidence to create a jury question."); *see also Reeves*, 530 U.S. at 151 ("[T]he court should give

credence to the evidence.  . . supporting the moving party that is uncontradicted and

unimpeached, at least to the extent that that evidence comes from disinterested witnesses.").

Accordingly, drawing all reasonable inferences in favor of Mrs. Berger, the evidence offered here

simply cannot support a reasonable fair-minded inference of her detrimental reliance on either

incomplete representations by PMUSA regarding the health effects and/or addictive nature of

smoking cigarettes, or, on statement(s) made or act(s) done in furtherance of a conspiracy to

conceal or omit material information from representations regarding the same.[19]  *See Rodriguez,*

*supra,* 518 F.3d at 1265 ("The issue is not whether the evidence was sufficient for [the losing

party] to have won, but whether the evidence was sufficient for it to have lost."); *Cleveland*,

*supra*, 369 F.3d at 1192; *Daniels, supra,* 692 F.2d at 1326; *see also* (Doc. 94).  That being so,

there is a failure of proof on the issue of Mrs. Berger's individual reliance.

## IV. New Trial

I turn finally to PMUSA's alternative motion for new trial.  Federal Rule of Civil Procedure

50(c)(1) expressly requires that I conditionally rule on a motion for new trial when granting a

---

App. 1980) ("It is a well-settled principle that a fact cannot be established by circumstantial evidence which is perfectly consistent with direct, uncontradicted, reasonable and unimpeached testimony that the fact does not exist."); *Marlo Investments, Inc. v. Verne*, 227 So. 2d 58, 60 (Fla. Dist. 1969) ("[W]hen there is direct evidence that proves the contrary, the inferences from circumstantial evidence must evaporate.").

[19] Because I find Mrs. Berger did not prove she relied to her detriment, I need not consider whether sufficient evidence supports the jury's determination that Mrs. Berger's detrimental reliance was a legal cause of her COPD.

renewed motion for judgment as a matter of law.  Upon review of the motion, I conditionally grant PMUSA's motion for new trial on Mrs. Berger's fraudulent concealment and conspiracy to fraudulently conceal claims.

I may grant a motion for a new trial if I find the jury's verdict to be contrary to the great weight of the evidence.  *E.g., Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988); *Williams v. City of Valdosta*, 689 F.2d 964, 972 (11th Cir.1982).  I am permitted to weigh the evidence, "but to grant the motion [I] must find the verdict contrary to the great, not merely the greater, weight of the evidence."  *Williams, supra*, 689 F.2d at 972.  In addition to a verdict being contrary to the great weight of the evidence, I have discretion to grant a motion for new trial on the basis of legal error.  *Id.* at 974-75 n.8; *O'Neil v. W. R. Grace & Co*., 410 F.2d 908, 913 (5th Cir. 1969); *accord Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

As detailed at length above, the great weight of the evidence is contrary to Mrs. Berger's fraudulent concealment and conspiracy verdict.  Mrs. Berger's own testimony is uncontradicted, direct evidence that she did not rely to her detriment on incomplete representations regarding the health effects and/or addictive nature of smoking cigarettes.  This alone is sufficient support for my conditionally granting a new trial on said claims.

Additionally, while I reserve judgment PMUSA's motion for judgment as a matter of law on all claims (Doc. 135), I take note of the Eleventh Circuit Court of Appeals's intervening decision *Graham v. R.J. Reynolds Tobacco Co.* (*Graham*)*,* 2015 WL 1546522 (11th Cir. 2015).  In *Graham*, the Eleventh Circuit held that, under preemption doctrine, the mechanics of *Engle*-progeny negligence and strict-liability claims amount to the functional equivalent of a flat ban on cigarette sales, and, are thus inconsistent with the full purposes and objectives of Congress.  *Id.* *16.  While

the *Graham* decision "express[es] no opinion as to the validity of other *Engle* claims, for example, fraudulent concealment or conspiracy to fraudulently conceal," *id.* *20, it nevertheless bears on the jury charge in this case.

As in *Graham*, the jury here was instructed in accordance with the *Douglas* framework: a finding of *Engle*-class membership necessarily compelled a finding for Mrs. Berger on her negligence and strict liability claims. Thus, I instructed the jury that it must "apply" the *Engle* findings in further deliberations, including PMUSA's negligence and strict liability.[20]  (Doc. 94). In regard to deliberating on claims material to this motion, I reminded and directed the jury to "accept" the *Engle* findings, including the finding

> that Philip Morris and others concealed or omitted material information, not otherwise known or available, knowing that the concealed or omitted information was false or misleading, or failed to disclose a material fact concerning the health effects and/or addictive nature of smoking cigarettes, or both.

(Doc. 94).

Assuming *Graham* remains binding precedent, the lens through which the jury viewed the elements of Mrs. Berger's fraudulent concealment and conspiracy claims was prejudiced by legal error.  *See Williams*, 689 F.2d at 974-75, n.8; *O'Neil,* 410 F.2d at 913; *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2805.  As such, no verdict on the

---

[20] The jury was instructed as follows: 1) Philip Morris was negligent; 2) Philip Morris placed cigarettes on the market that were defective and unreasonably dangerous; 3) Philip Morris and others concealed or omitted material information, not otherwise known or available, knowing that the concealed or omitted information was false or misleading, or failed to disclose a material fact concerning the health effects and/or addictive nature of smoking cigarettes, or both; 4) Philip Morris and others agreed to conceal or omit material information regarding the health effects of cigarettes or their addictive nature with the intention that smokers in the public would rely on the concealed or omitted information to their detriment; 5) The nicotine in cigarettes is addictive; and 6) Smoking cigarettes causes COPD.  (Doc. 94).

subject claims would have been properly rendered.

## V.  Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT

1.      PMUSA's motion for judgment as a matter of law (Doc. 136) be, and the same

         hereby is granted;

2.      The award of punitive damages against PMUSA and in favor of Mrs. Berger be, and

         the same hereby is vacated;[21]

3.      PMUSA's alternative motion for new trial on the subject claims is conditionally

         granted;

4.      Judgment previously entered in this case (Doc. 131) is hereby vacated and held in

         abeyance pending the entry of final mandate in *Graham v. R.J. Reynolds Tobacco*

         *Co., et al.*, No. 13-14590 (*Graham*); and

5.      PMUSA's motion for leave to file supplemental briefing (Doc. 154) is denied

         without prejudice to refiling subsequent to the entry of final mandate in *Graham*.

         Ruling is held in abeyance on PMUSA's remaining motion for judgment as a matter

         of law (Doc. 135).  All post-trial proceedings in this action are stayed pending

─────────────────

[21] I take note of the pendency of *Lucille Ruth Soffer, etc. v. R.J. Reynolds Tobacco Company*, SC13–139, *see R.J. Reynolds Tobacco Co. v. Soffer*, 139 So. 3d 887 (Fla. 2014), in which the Florida Supreme Court heard argument on December 4, 2015.  As raised at oral argument, it is unclear at this juncture what procedure would be appropriate should the First District Court of Appeal's decision in *Soffer v. R.J. Reynolds Tobacco Co.* be overtured.  *See* 106 So. 3d 456, 457 (Fla. App. 2012) *reh'g denied, clarification granted sub nom Soffer ex rel. Soffer v. R.J. Reynolds Tobacco Co.*, 106 So. 3d 465 (Fla. App. 2013).  Should a new trial on punitive damages be deemed appropriate, Mrs. Berger is granted leave to move for such relief.

resolution of any petition for en banc consideration and rehearing in *Graham*.  The

parties shall file notice when this matter is resolved.


So ordered.


/s/ James G. Carr
Sr. U.S. District Judge