## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

Judith Berger,

        Plaintiff,

v.

Philip Morris USA, Inc.,

        Defendant.

Case No.  3:09-cv-14157

**ORDER**

Carr, D.J.[1]

      This is an *"Engle*-progeny"[2] lawsuit by Plaintiff Judith Berger ("Mrs. Berger"), a former

smoker of cigarettes, against the manufacturer of those cigarettes, Defendant Philip Morris USA,

Inc. ("PM USA").  Mrs. Berger, who now suffers from advanced chronic obstructive pulmonary

disorder ("COPD"), alleged that PM USA was liable to her under theories of negligence, strict

liability, fraudulent concealment, and conspiracy to conceal.  Following a trial, the jury returned

a verdict for Mrs. Berger on each of these four claims, and awarded compensatory damages in

the amount of $6.25 million (with a 40% comparative fault finding).[3]  (Doc. 92).  Later, the jury

---

[1]      Senior U.S. District Judge, N.D. Ohio, sitting by designation.

[2]      I refer to the cases filed pursuant to the Florida Supreme Court's opinion in *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006) (*Engle III*), as "*Engle*-progeny cases."  There, the Court decertified a statewide class of smokers and their survivors, but allowed members of the decertified class one year in which to file individual lawsuits, referred to as "the *Engle* savings period."  *Id.* at 1277.  For a detailed history of the *Engle* litigation, see *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1326-29 (11th Cir. 2010), and *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011).  I presume the reader's familiarity with the *Engle*-progeny litigation.

[3]      Thus, Mrs. Berger's compensatory recovery is $3.75 million.

awarded $20,760,000.14 in punitive damages based on Mrs. Berger's fraudulent concealment and conspiracy-to-conceal claims.[4]  However, I subsequently granted PM USA judgment as a matter of law with respect to the fraudulent concealment and conspiracy-to-conceal claims, because the evidence failed to establish that Mrs. Berger had relied on PM USA's concealments and misrepresentations about the hazards of cigarette-smoking.  (Doc. 155).  In the same order, I also vacated the $20.7 million punitive damages award.  (*Id.* at 27, ¶ 2).[5]

Now pending is PM USA's Renewed Motion for Judgment as a Matter of Law on All Claims (Doc. 135, "Motion"), to which Mrs. Berger has responded (Doc. 146, "Response").  To some extent, PM USA's Motion is moot in light of my previous order granting judgment as a matter of law with respect to the fraudulent concealment and conspiracy-to-conceal claims. Otherwise, I deny PM USA's Motion for the reasons that follow.  Because PM USA acknowledges that I have already rejected many of its arguments (Doc. 135 at 1), I discuss most fully PM USA's argument that federal law impliedly preempts Mrs. Berger's negligence and strict liability claims.

## I.  Background

The facts, except as relevant to the negligence and strict liability claims, need no recounting, as I covered them in detail in my order granting judgment as a matter of law in PM USA's favor (Doc. 55, at 2-6), and are familiar to the parties.

Although the background of the larger *Engle* saga is important, I merely incorporate the history of the *Engle* litigation history as the Eleventh Circuit described it in *Graham v. R.J.*

---

[4]     At the time of trial, I did not permit the jury to consider awarding punitive damages with respect to Mrs. Berger's negligence and strict liability claims.  (<u>See</u> Doc. 127 at 39-40).

[5]     Unless otherwise noted, when citing to documents on an electronic docket, I refer to the page number given by the electronic docketing program.

*Reynolds Tobacco Co.*, 782 F.3d 1261, 1265-67 (11th Cir. 2015), *vacated* 811 F.3d 434 (11th Cir. 2016), *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1281-86 (11th Cir. 2013), and *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 422-25 (Fla. 2013).  I therefore merely summarize only relevant portions in this order.

The Florida Supreme Court approved giving the following findings from the "*Engle* Phase I*" trial "*res judicata*" effect:

> (i) [T]hat smoking cigarettes causes certain named diseases including COPD and lung cancer; (ii) that nicotine in cigarettes is addictive; (iii) that the *Engle* defendants placed cigarettes on the market that were defective and unreasonably dangerous; (iv) that the *Engle* defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both; (v) that the *Engle* defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; (vi) that all of the *Engle* defendants sold or supplied cigarettes that were defective; (vii) that all of the *Engle* defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants; and (viii) that all of the *Engle* defendants were negligent.

*Douglas,* 110 So.3d at 424–25 (alterations omitted) (footnote omitted) (quotation marks omitted) (quoting *Engle III,* 945 So.2d at 1276–77).

The Florida Supreme Court has clarified that the Phase I findings conclusively established the "'conduct elements' of plaintiffs' tort claims – duty, breach, and 'general causation[.]'"[6] *Graham*, 782 F.3d at 1270-71 (quoting *Douglas*, 110 So. 3d at 428).  Because the Phase I findings established the "conduct" and "defect" elements of the class members' negligence and strict liability claims, the only issues for the parties to litigate in individual cases

---

[6]    "General causation" refers to the finding that smoking cigarettes generally causes certain diseases, such as lung cancer, cardiovascular disease, and COPD.

were "(i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking

the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged; and

(iii) damages." *Douglas*, 110 So. 3d at 430 (citations omitted).

The tobacco companies have objected to this procedure, arguing that allowing the Phase I

findings to establish the conduct and defect elements of the plaintiffs' product liability claims

violates due process. *See Walker*, 734 F.3d 1278, *supra*. The Eleventh Circuit has rejected that

argument, however. *Id.* at 1288-89 (observing that "R.J. Reynolds had a full and fair opportunity

to litigate the issues of common liability in Phase I," and reasoning that no court, including the

Supreme Court, has yet to hold that the Due Process Clause entitles a party "to the application of

the traditional law of issue preclusion.").

Thus, in this case, my jury instructions followed the post-*Walker* regime of treating the

*Engle* findings as conclusively establishing the defect and conduct elements of Mrs. Berger's

strict liability and negligence claims. (Doc. 94 at 19-24, 26). I instructed the jury that Mrs.

Berger was entitled to benefit from the *Engle* Phase I findings if she proved: (1) her COPD

manifested on or before November 21, 1996; (2) she was addicted to cigarettes containing

nicotine; and (3) her addiction was a legal cause of her COPD. (*Id.* at 19). I instructed the jury

that if it made each of those findings, then it was to presume, among other things, that: (1) PM

USA was negligent; (2) PM USA placed cigarettes on the market that were defective or

unreasonably dangerous; (3) nicotine in cigarettes is addictive; and (4) smoking cigarettes causes

COPD. (*Id.* at 23).

The jury determined that Mrs. Berger's COPD manifested on or before November 21,

1996, she was addicted to cigarettes, and her addiction was a legal cause of her COPD. (Doc.

92).  The jury awarded compensatory damages as noted earlier, and it apportioned 40% of the fault to Mrs. Berger and 60% of the fault to PM USA.  (*Id.*).

Following the verdict, PM USA renewed its pre-submission motion for judgment as a matter of law on all claims.  (*See* Doc. 85, Doc. 135).

## II.  Standard

The standard for granting a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is the same as the standard for granting the pre-submission motion under Rule 50(a).  *Chaney v. City of Orlando, Fla.,* 483 F.3d 1221, 1227 (11th Cir. 2007) (citation omitted).  Under that standard, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence."  *Id.*  A court "should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1192 (11th Cir. 2004).  "The issue is not whether the evidence was sufficient for [the losing party] to have won, but whether the evidence was sufficient for it to have lost."  *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1265 (11th Cir.2008).

While I review all evidence of record, I am to draw all reasonable inferences in favor of the nonmoving party.  I "must disregard all evidence favorable to the moving party that the jury is not required to believe ... [giving] credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150–51 (2000) (internal citation and quotations omitted).

Moreover, I may not make credibility determinations or weigh the evidence.  *Id.* at 150; *Beckwith v. City of Daytona Beach Shores, Fla.,* 58 F.3d 1554, 1560 (11th Cir. 1995). "The line

of demarcation which [I am] required to walk is ephemeral: [I] must conclude that an inference is unreasonable without falling into the trap of weighing all the evidence." *Helene Curtis Indus., Inc. v. Pruitt,* 385 F.2d 841, 851 (5th Cir.1967); *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir.1982). "The standard for determining whether an inference is allowable is generally whether it is a reasonable one, that is, whether it is one that 'reasonable and fair-minded men in the exercise of impartial judgment' might draw from the evidence." *Daniels, supra,* 692 F.2d at 1326 (citation omitted). Ultimately, I am to leave the jury's verdict intact "if there is evidence from which [the jury] ... reasonably could have resolved the matter the way it did." *Rodriguez,* 518 F.3d at 1264.

### III.  Discussion

### A.  Whether Plaintiff Can Rely on the *Engle* Phase I Findings to Prove Certain Elements of Her Claims

PM USA first contends that allowing Mrs. Berger to rely on the *Engle* Phase I findings to establish the conduct and defect elements of her negligence and strict liability claims violates due process.  (Doc. 135 at 3-11).  The Eleventh Circuit rejected this argument, which I deny, in *Walker*, 734 F.3d 1278, *supra*.  PM USA acknowledges this fact, and makes the argument only to preserve its objection to that result. (Doc. 135 at 1).

PM USA also contends that Mrs. Berger cannot use the *Engle* Phase I findings to establish the conduct elements of her fraudulent concealment and conspiracy-to-conceal claims. (Doc. 135 at 11-14).  This argument is moot as I have granted PM USA judgment as a matter of law with respect to these two intentional tort claims.

### B.  Whether Plaintiff Waived the Right to Rely on the *Engle* Phase I Findings

PM USA argues that Plaintiff waived the right to rely on the *Engle* findings by introducing independent evidence of PM USA's tortious conduct. (Doc. 135 at 14-15). PM USA does not point to any authority supporting the position that an *Engle*-progeny plaintiff, who introduces any additional evidence concerning the tobacco companies' conduct, thereby *waives* the right to rely on Phase I findings. "The crux of the waiver doctrine rests upon conduct demonstrating an intent to relinquish a known right." *Ferry-Morse Seed Co. v. Hitchcock*, 426 So. 2d 958, 962 (Fla. 1983). The mere act of introducing separate evidence of PM USA's tortious conduct falls far short of constituting an intent to knowingly relinquish the right to rely on the *Engle* findings. Indeed, PM USA made only a general relevancy objection when Mrs. Berger introduced such additional evidence (Doc. 135-3); it did not argue that Mrs. Berger would waive the right to rely on the *Engle* findings by doing so. Not having given notice of its contention when it was timely to do so, PM USA, if anyone, and certainly not Mrs. Berger, has committed waiver.

There being no basis for attributing to Mrs. Berger or her counsel an intent to waive reliance on the *Engle* findings, PM USA's argument is meritless.

### C. Whether the Evidence Was Insufficient to Support Plaintiff's Claims

Next, PM USA briefly argues that the evidence was insufficient as a matter of law to support the jury verdicts on any of Mrs. Berger's claims. (Doc. 135 at 15-17). In a separate motion (Doc. 136), PM USA gave more in-depth arguments about why it was entitled to judgment as a matter of law on Mrs. Berger's fraudulent concealment and conspiracy-to-conceal claims. I granted the motion regarding fraudulent concealment and conspiracy-to-conceal because the evidence failed to show that Mrs. Berger relied on PM USA's fraudulent

misrepresentations when she continued to smoke.  (Doc. 155).  Thus, PM USA's argument is moot to the extent it concerns fraudulent concealment and conspiracy-to-conceal.

With respect to Mrs. Berger's non-intentional tort claims, PM USA's argument is cursory and conclusory: it claims Mrs. Berger failed to introduce evidence establishing any element of a negligence claim (i.e., duty, breach of duty, causation, and damages).  PM USA also argues that she failed to introduce evidence proving that it sold a defective product, or that such a product proximately caused her injuries.

There is a simple explanation for any lack of proof (which I do not find wanting) at trial: namely, Mrs. Berger enjoyed the preclusive effect of the *Engle* Phase I findings.  *See Douglas*, 110 So. 3d at 428.  Thus, Mrs. Berger was not required to independently prove up the duty, breach, defectiveness, or "general causation" elements of her claims.  All Mrs. Berger had to prove was "(i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged; and (iii) damages." *Douglas*, 110 So. 3d at 430.  This is the very procedure the Eleventh Circuit approved in *Walker*, 734 F.3d 1278, *supra*.

The record refutes any argument PM USA might try to make that the evidence on causation and damages was so lacking that no reasonable juror could have found for Mrs. Berger.[7]  Over the course of a six-day trial, the jury heard testimony from five witnesses for the plaintiff, including Mrs. Berger (Doc. 113 at 8-156), Dr. Daniel Layish (her treating pulmonologist) (Doc. 115 at 33-122), Dr. Neil Grunberg (an addiction expert) (Doc. 115 at 148-75, Doc. 117, Doc. 119, Doc. 121, Doc. 123), and two other experts.

---

[7]      PM USA does not contend that the evidence was insufficient to show that Mrs. Berger was an *Engle* class member.  (*See* Doc. 135 at 15-17).

Dr. Grunberg gave extensive testimony about how nicotine is addictive and creates dependence.   Mrs. Berger's testimony confirmed that she was addicted to cigarettes, as she described a habit of smoking a pack-and-a-half of cigarettes a day for nearly forty years, during which she experienced two failed attempts to quit.   Mrs. Berger also described how COPD, first diagnosed after nearly four decades of smoking, affected overall her health and quality of life. Her own presence in the courtroom – wheelchair bound and tethered to an oxygen tank – vividly confirmed her testimony and that of her other witnesses.   Moreover, Dr. Layish testified that Mrs. Berger's smoking habit "absolutely" caused her COPD, and that he had ruled out other potential causes of the disease.  (Doc. 115 at 46-48).   There was no failure of proof as to specific causation and damages.

### D.  Whether Federal Law Preempts Plaintiff's Claims

PM USA argues that the Federal Cigarette Labeling and Advertising Act ("the Labeling Act"), 15 U.S.C. §§ 1331 *et seq*., preempts Mrs. Berger's claims to the extent she relies on evidence "relating to post-1969 advertising and labeling."   (Doc. 135 17-18).   Mrs. Berger introduced some evidence of post-1969 advertising and labeling in support of her fraudulent concealment and conspiracy-to-conceal claims.   Because I granted PM USA judgment as a matter of law with respect to those two claims though, that argument is moot.[8]

---

[8]    To the extent Mrs. Berger bases her negligence claim on the theory that PM USA provided inadequate warnings, the Labeling Act would also preempt the claim insofar that she relies on evidence of post-1969 advertising and labeling.  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524-25, 530-31 (1992).   However, Mrs. Berger began smoking cigarettes (and apparently became addicted) before 1969, and therefore she may rely on evidence of pre-1969 advertising and labeling.   Additionally Mrs. Berger's negligence and strict liability claims are not based only on advertising.   The claims are also based on the manufacturing and design of PM USA's cigarettes, which are theories that neither the Act nor *Cipollone* preempts.  505 U.S. at 523.

The main issue is whether federal law impliedly preempts Mrs. Berger's negligence and strict liability claims. (*Id.* at 18-19). Specifically, PM USA invokes a form of conflict preemption known as "obstacle preemption":

> The doctrine of conflict preemption precludes state-law tort claims that stand "as an obstacle to the accomplishment and execution of… important… federal objectives." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). One such important federal objective is Congress's decision to foreclose the removal of tobacco products from the market despite their known health risks and addictive properties. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137 (2000). Here, Plaintiff improperly sought to establish PM USA's liability based on the inherent dangers of cigarettes, without proving the elements of her strict liability and negligence claims through evidence of defect, negligence, and legal causation. Such means of establishing liability are barred under conflict preemption principles.

(Doc. 135 at 18-19).

I am well aware that the now vacated, now non-binding panel opinion in *Graham*, 782 F.3d 1261, endorsed PM USA's argument. I would prefer to await the *en banc* opinion in that case before ruling on the instant motion. However, due to unusual and compelling circumstances, I have determined I should address the issue now.[9]

I begin with the panel decision in *Graham*, which concluded that federal law impliedly preempts *Engle*-progeny negligence and strict liability claims:

> [A]s a result of the interplay between the Florida Supreme Court's interpretations of the *Engle* findings and the strictures of due process, the necessary basis for Graham's *Engle*-progeny strict-liability and negligence claims is that all cigarettes sold during the class period were defective as a matter of law. This, in turn, imposed a common-law duty on cigarette manufacturers that they necessarily

---

[9]   Plaintiff's counsel represent that Mrs. Berger is in rapidly failing health. Having observed Mrs. Berger's condition at trial in September 2014, I have no reason to doubt this representation. Counsel further represent that Mrs. Berger has no children or other survivors, other than her equally-ailing husband. Counsel represent that if both were to die before the judgment becomes final, no one would remain to prosecute the action, and PM USA could avoid liability on a technicality. Therefore, in the interest of justice, I have decided to proceed on issuing a decision.

breached every time they placed a cigarette on the market. Such a duty operates, in essence, as a ban on cigarettes. Accordingly, it conflicts with Congress's clear purpose and objective of regulating—not banning—cigarettes, thereby leaving to adult consumers the choice whether to smoke cigarettes or to abstain. We therefore hold that Graham's claims are preempted by federal law.

782 F.3d at 1282.

Thus, the panel found that the Labelling Act preempted the *Engle* plaintiffs' state law product liability claims because they stood as an obstacle to the Act's objectives and purposes. Congress, in the panel's view, sought via the Act to guarantee that cigarettes would remain on the market in all fifty states regardless of whatever views the states might variously have had towards the unimpeded sale of cigarettes.

Like other courts in Florida, *e.g. R.J. Reynolds Tobacco Co. v. Marotta*, 182 So. 3d 829, 831-34 (Fla. 4th DCA 2016), and around the country, *e.g.*, *Hunter v. Philip Morris USA, Inc.*, 582 F.3d 1039, 1046-48 (9th Cir. 2009); *Pennington v. Vistron Corp.*, 876 F.2d 414, 417-23 (5th Cir. 1989), which have rejected preemption claims, I find entirely unpersuasive PM USA's arguments and the panel's rationale that somehow Congress, when it decided not to ban cigarette sales *in toto*, it thereby implicitly preempted state law product liability.

## 1.  The Inherent Characteristics of Cigarettes Were not the Sole Basis for Phase I Common Law Liability

PM USA bases its obstacle preemption argument on the contention that Mrs. Berger seeks to impose liability "on the *inherent* dangers of cigarettes."  (Doc. 135 at 19) (emphasis added); *see also Graham*, 782 F.3d at 1273.  According to the panel in *Graham*, basing liability on the properties inherent to all cigarettes makes the Phase I verdict a functional "ban," which Congress allegedly foreclosed the states from enforcing.  782 F.3d at 1282.  PM USA evidently believes that the Phase I findings were "premised on the theory that *all* cigarettes are inherently

defective and that *every* cigarette sale is an inherently negligent act." *Id.* at 1285 (emphasis in original).

PM USA's characterization of the *Engle* findings is hard to reconcile with what occurred at the Phase I trial, taking into account the *Engle* plaintiffs' allegations, the evidence presented in Phase I, the jury instructions, and the structure and content of the Phase I verdict itself. To begin with, the *Engle* plaintiffs did not bring allegations against *every tobacco company* that sold cigarettes in Florida, which would have made little sense if their theory was that *all* cigarettes are inherently dangerous. (*See* Amicus Brief of John S. Mills, *et al.*, at 23, 11th Cir. Case No. 13-14590, filed May 4, 2015) ("Mills Br.").

Indeed, the *Engle* plaintiffs sought to prove liability based on more than just the qualities inherent in all cigarettes. For instance, the plaintiffs claimed that the named defendants "*manipulated* the level of nicotine in their tobacco products so as to make these products addictive." Mills Br. at 23 (citing *Engle* Complaint at 8-9) (emphasis added). The plaintiffs also alleged that the defendants failed to: (1) use available safer alternative designs and (2) warn consumers of what they had done. Mills Br. at 23 (citing *Engle* Complaint at 36-37, 50-51). While the jury heard a mixture of evidence on both brand-specific defects and on the addictive and hazardous properties of cigarettes, there was across-the-board evidence that each of *these defendants* did more than merely manufacture cigarettes. As the Phase I trial judge explained in denying the tobacco companies' motion for a directed verdict,

> There was more than sufficient evidence at trial to satisfy the legal requirements of this [c]ount and to support the jury verdict that cigarettes manufactured and placed on the market by the [*Engle*] defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime[s] by utilization of ammonia to achieve a desired "free basing effect" of pure nicotine to the brain, and sometime[s] by using a higher nicotine content tobacco called Y-1, and by other means such as

manipulation of the levels of tar and nicotine. The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilized glass fibers that could produce disease and deleterious effects if inhaled by a smoker.

*Engle v. R.J. Reynolds Tobacco*, 2000 WL 33534572, at *2 (Fla. 11th Cir. Ct. 2000) ("*Engle F.J.*").

While nicotine addiction and some diseases might be inherent to tobacco, the conduct described above, like manipulating nicotine delivery, is *not* an inherent part of manufacturing cigarettes.

The Phase I Verdict Form's instructions on negligence reinforce the conclusion that the jury based its *Engle* findings on more than just the inherent characteristics of cigarettes. The negligence instruction asked the jurors to determine whether each defendant "failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances." (Phase I Verdict at 10).[10]

The instruction presupposed that a cigarette manufacturer could place cigarettes on the market without being inherently negligent. *See* Mills Br. at 26. The jury answered "yes" for each defendant for every time frame (except Brooke Group) (Phase I Verdict at 10-11), but that did not mean the jury grounded its Phase I findings on nothing other than the intrinsic properties of cigarettes. I presume that a jury followed its instructions. *E.g.*, *Evans v. Michigan*, --- U.S. ---, ---, 133 S. Ct. 1069, 1080 (2013). Applying that presumption here, I presume the Phase I jury first considered the existence of "a reasonable cigarette manufacturer" and how such a company

---

[10]     I take judicial notice of the Phase I verdict form, which a court in this District entered into evidence in an *Engle*-progeny case as an exhibit, *Bernice Brown v. R.J. Reynolds Tobacco Co.*, *et al.*, Case No. 3:07-cv-761-J-34HTS, Doc. 43, Exhibit 1.

would behave "under like circumstances." I also presume that, in light of that benchmark, the Phase I jury then concluded that the seven defendants listed in the Phase I verdict form failed to exercise that degree of care.  Thus, what the jury actually decided, as reflected in the Phase I verdict, is that the named defendants failed to exercise the degree of care of a reasonable cigarette manufacturer, not that *all* cigarette manufacturers necessarily, and without due regard for the safety of their products, are or always would be negligent *per se*.

Likewise, the product liability instruction asked the Phase I jurors to determine whether each defendant "place[d] cigarettes on the market *that were defective and unreasonably dangerous*." (Phase I Verdict at 2).  The final six words qualify the word "cigarettes," and they presuppose that not every cigarette is "defective and unreasonably dangerous."  The jury generally determined that cigarette-smoking causes 20 different diseases, and that nicotine is addictive (*id.* at 1-2), so if strict liability were founded merely on those properties, the strict liability question would simply have asked whether each defendant "place[d] cigarettes on the market" -- period.  But the strict liability inquiry did not end there.  The court asked the jury to determine discretely whether each of the seven defendants "place[d] cigarettes on the market *that were defective and unreasonably dangerous*."  The jury determined that each defendant did.  (*Id.* at 2-3).  Assuming the jury followed its instructions, what it actually decided is that each defendant's particular cigarettes were defective, not that *all* cigarettes are inherently defective.  Accordingly, I reject PM USA's characterization of the Phase I liability findings as being based on nothing more than the inherent properties of cigarettes.

### 2.  Even if the Phase I Findings Were Founded on the Inherent Characteristics of Cigarettes, Engle Verdicts Still Would Not Function as a "Ban"

Even if the jury based its *Engle* verdicts on the inherent defectiveness of all cigarettes and the *per se* negligence of all cigarette manufacturers, its findings would not prohibit the sale of cigarettes.  *See Marotta*, 182 So. 3d at 832 ("[T]ort verdicts… do not always rise to a state law standard; sometimes they may only motivate an optional decision for a defendant to behave differently[.]") (quotations marks and citation omitted).

Had the Phase I verdict created a ban on cigarette sales, those sales would have ended two decades ago.  Cigarette makers want to eat their cake and have it too. Trying to erect a purported ban on cigarette sales to evade liability, they continue to profit from their products, feeling, as they do so, no real-world constraint or restriction from the Phase I verdict.  *Res ipsa loquitor*.

### 3.  Even if Engle-Progeny Negligence and Product Liability Verdicts Amounted to a Ban on Cigarettes, such a Ban is not Impliedly Preempted

Lastly, even if *Engle* product liability verdicts embody a judgment that all cigarettes are defective and that selling cigarettes is an inherently negligent act, federal law does not impliedly preempt Florida from enforcing such a functional ban.  Although the federal government has chosen to regulate aspects of the cigarette industry while stopping *itself* short of banning cigarettes, it did not intend to force *the states* to accept that cigarettes must remain on *their* markets.  Because I cannot infer such a heavy-handed intent from Congress's enactments over the years, I do not conclude that *Engle* product liability actions "stand as an obstacle" to the objectives of Congress.

Under the Supremacy Clause, federal law is "the supreme Law of the Land… any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI.  Thus, state laws that "interfere with, or are contrary to" federal law "must yield."  *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824).  Congress can directly preempt state law through an express

preemption provision.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). However, federal law can impliedly preempt state law in the absence of an express preemption provision where there is a conflict between the two laws.  One way in which such a conflict arises is where a state law "stands as an obstacle to the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  This is the doctrine of "obstacle preemption," which is the theory PM USA advances here.  (Doc. 135 at 18-19).

The Supreme Court has stated that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act."  *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (quotation marks omitted).  "Implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives."  *Id.*  Nor should preemption "be inferred from every Congressional enactment that overlaps [with] state regulation."  *Pennington*, 876 F.2d at 417.

Instead, there is a considerable presumption against preemption where "federal law is said to bar state action in fields of traditional state regulation."  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  That presumption is a "cornerstone[]" of preemption jurisprudence.  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  A court begins "with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the *clear and manifest purpose of Congress*."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (emphasis added).  The Supreme Court's preemption jurisprudence recognizes that state regulation enjoys "historic primacy" when it comes to "matters of health and safety."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  The States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Id.* at 475 (internal quotation marks and citation

omitted).  Therefore, a court should not attribute to Congress the intent to "cavalierly preempt state-law causes of action" touching on matters of public health.  *Id.* at 485.  Indeed, a state's power to regulate matters of health and safety encompasses the power to regulate cigarettes, or even to ban their sale entirely.  *Austin v. Tennessee*, 179 U.S. 343, 348-49 (1900).

Accordingly, if PM USA is to prove that Congress impliedly intended to foreclose the states from enforcing a legal duty that would ban cigarette sales, it has "a tough row to hoe." *Graham*, 782 F.3d at 1275.  "In assessing the extent to which state law stands as an obstacle to the . . . purposes and objectives of Congress, [w]hat [constitutes] a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id.* at 1276 (quotation marks and citations omitted).  Because "the purpose of Congress is the ultimate touchstone in every pre-emption case," *Lohr*, 518 U.S. at 485, the first step is to ascertain the nature of the federal interest, *Graham*, 782 F.3d at 1276 (citation omitted).

Over the past five decades, Congress has enacted various laws regulating certain aspects of the cigarette industry, the most notable being labeling and advertising.  *See Graham*, 782 F.3d at 1276-79.  In its first move to address the health effects of cigarettes, Congress enacted the "Labeling Act" in 1965, Pub. L. No. 89-92, 79 Stat. 282 (1965), which sought to "establish a comprehensive Federal program to deal with cigarette labeling and advertising."  *Graham*, 782 F.3d at 1277 (quoting Pub. L. No. 89-92, 79 Stat. 282, § 2).  The Labeling Act required cigarette packages to display a warning that cigarette smoking may be hazardous to the consumer's health. *Id.*  Congress's statement of policy reflected that it sought to balance two competing interests: first, ensuring that the public learned about the dangers of cigarette smoking "by inclusion of a warning to that effect on each package of cigarettes," and second, protecting commerce and the

national economy, and ensuring that it was "not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations." 15 U.S.C. § 1331. After 1969, the law expressly preempted any "requirement or prohibition based on smoking and health" from "be[ing] imposed under State law with respect to the advertising and promotion of any cigarettes" that were packaged and labeled in conformity with the provisions of the Labeling Act. 15 U.S.C. § 1334(b); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 520-24 (1992). Thus, the Labeling Act preempted common law claims based on inadequate warnings. *Cippolone*, 505 U.S. at 530-31. However, it did not preempt other common law claims beyond the scope of the preemption clause, *id.* at 517, such as defective design claims, *id.* at 523.[11]

Since the Labeling Act's passage, Congress has refined consumer warnings and expanded regulation into other areas, such as by regulating smokeless tobacco through the Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, 100 Stat. 30 (1986). Overall though, "Congress's basic goals have remained largely unchanged." *Graham*, 782 F.3d at 1277. Congress has known that nicotine is addictive and that cigarette smoke contains carcinogens, but instead of banning cigarettes, it has developed a regulatory scheme concerned with advertising, labeling, and sales. *Id.* at 1277-79.

The question is whether this combination of knowledge and partial regulation demonstrates that Congress had the "clear and manifest purpose" to preempt a classic exercise of a state's police powers: banning cigarette sales. *See Rice*, 331 U.S. at 230. I think not. Deliberate inaction can support an inference of preemption where Congress refrains from acting in an area it otherwise regulates so comprehensively that it occupies the field (i.e., "field

---

[11]    For the reasons stated in *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1192 (11th Cir. 2004), courts treat each part of the *Cipollone* plurality opinion as the majority opinion.

preemption," which PM USA does not assert here).  *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988).  In other contexts though, inaction alone cannot support an inference of preemption because "otherwise, deliberate federal inaction could always imply pre-emption, which cannot be."  *Id.*  Thus, the Supreme Court has refused to find implicit preemption of state-law product liability claims just because the basis for such laws was a duty that a federal body chose not to impose.  *Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323, 330-37 (2011) (Department of Transportation's decision not to require installation of shoulder-and-lap belts did not preempt tort suit based on manufacturer's failure to do so); *Wyeth*, 555 U.S. at 565-67, 573-81 (although Food and Drug Administration refrained from requiring drug manufacturer to warn about the dangers of a certain injection method, state-law negligence and strict liability claims could proceed on that basis; obstacle preemption not a bar).

Indeed, inferring that a state-law prohibition frustrates the objectives of Congress whenever Congress chooses to regulate a product or activity, but stops itself short of enacting a complete ban, would represent a breathtaking expansion of obstacle preemption that would threaten to contract greatly the states' police powers.  Micah Berman, *Eleventh Circuit finds Tobacco Suits Preempted: Trouble for Future Public Health Regulations?*, Yale J. on Reg., Apr. 19, 2015.[12]

If Congress knew about the addictive and hazardous properties of cigarettes, it also surely knew about widespread tort litigation dealing with tobacco's ravaging effects on health.  *See Goodyear Atomic Corp.*, 486 U.S. at 184-85 ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").  Indeed, the premise for some of these lawsuits was "that cigarettes are unreasonably dangerous per se."  *Pennington*, 876

---

[12]     http://www.yalejreg.com/blog/eleventh-circuit-finds-tobacco-suits-preempted-trouble-for-future-public-health-regulations-by-micah

F.2d at 417.  Yet Congress has never manifested a preemptive impulse toward state law remedies of which it presumably knew when it acted.

As a provision in the Family Smoking Prevention and Tobacco Control Act of 2009 ("TCA") states:

> (b) Rule of construction regarding product liability
>
> No provision of this subchapter relating to a tobacco product shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.

21 U.S.C. § 387p(b).

Congress has typically limited itself to preempting the states' power to impose their own requirements concerning such things as labeling, advertising, and product adulteration.   15 U.S.C. §§ 1334, 4406; 21 U.S.C. § 387p(a)(2); *see also Cipollone*, 505 U.S. at 523-31.  Beyond that though, Congress was silent on preemption, despite evidently being aware of tobacco litigation.  Congress's

> silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend [federal] oversight to be the exclusive means of ensuring [tobacco safety]. As Justice O'Connor explained in her opinion for a unanimous Court: "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them."

*Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)) (third alteration in original).

"If Congress thought state-law tort suits posed an obstacle to its objectives," and if one of Congress's objectives was to foreclose the states from prohibiting cigarette sales, "it surely would have enacted [a broader] express pre-emption provision at some point" over the course of

decades of tobacco lawsuits.  *Wyeth*, 555 U.S. at 574.[13]  Instead, Congress expressly preempted *some* state-law requirements affecting tobacco, but it did not expressly preempt lawsuits based on broader common law duties governing cigarettes.  *Cipollone*, 505 U.S. at 523.  Indeed, PM USA does not contend that Congress expressly did so.  (*See* Doc. 135 at 18-19).

I recognize that, as a general proposition, the "lack of express preemption 'does *not* bar the ordinary working of conflict pre-emption principles.'"  *Graham*, 782 F.3d at 1275 (emphasis in original) (quoting *Geier*, 529 U.S. at 869).  However, in the specific context of tobacco, the Supreme Court has stated that

> the pre-emptive scope of the [Labeling Act] is governed entirely by the express language in § 5 of each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," *Malone v. White Motor Corp.,* 435 U.S., at 505, 98 S.Ct., at 1190, "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. *California Federal Savings & Loan Assn. v. Guerra,* 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.). Such reasoning is a variant of the familiar principle of *expressio[ ] unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections.

*Cipollone*, 505 U.S. at 517; *but see Altria Group, Inc. v. Good*, 555 U.S. 70, 87-90 (2008) (applying obstacle preemption analysis to the Labeling Act, without acknowledging *Cipollone* in that part of the discussion, but finding plaintiff's deceptive practices claim was not preempted).

The Supreme Court has thus concluded that the preemptive scope of the Labeling Act gives a "reliable indicium of congressional intent with respect to state authority," *Cipollone*, 505

---

[13]     In 1954, a woman named Eva Cooper filed one of the earliest known lawsuits against the tobacco companies, alleging that the cigarettes manufactured by R.J. Reynolds Tobacco Company were responsible for her husband dying from lung cancer.  BBC News, The U.S. Tobacco Wars, Sep. 28, 1999, http://news.bbc.co.uk/2/hi/americas/457180.stm; PBS Frontline, Inside the Tobacco Deal, May 1998, http://www.pbs.org/wgbh/pages/frontline/shows/settlement/timelines/fullindex.html.

U.S. at 517, and as such, matters not expressly preempted, like state-law obligations to avoid marketing defectively designed cigarettes, are not precluded, *id.* at 523.

Putting *Cipallone* aside, I still consider whether a common-law ban on cigarette sales presents an obstacle to the objectives of Congress.  Although the plain wording of an express preemption clause "'necessarily contains the best evidence of Congress' preemptive intent,'" *Whiting*, 131 S. Ct. at 1977 (quoting *CSX Transp, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)), a statute's *anti*-preemption clause (or "savings clause") will also inform whether a state-law requirement is an obstacle to the objectives of Congress. *Id.* at 1981-85.  If a state-law requirement falls within the scope of an anti-preemption clause, it cannot be said to stand as an obstacle to Congress achieving its objectives, because Congress has already determined that such a state-law requirement is acceptable.  *See id.* at 1981 ("Given that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority.").

PM USA ignores that each time Congress has regulated certain aspects of the tobacco industry, it has expressly preserved broad state authority to regulate, or even to entirely ban cigarette sales.   When Congress passed the Comprehensive Smokeless Tobacco Health Education Act of 1986, for example, it stated that "[n]othing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person."  Pub.L. No. 99-252, § 7(c), 100 Stat. 34 (1986) (codified at 15 U.S.C. § 4406(c)).  Even more directly, when Congress passed the TCA as recently as 2009, it broadly stated:

(a) In general

(1) Preservation

Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of a

Federal agency (including the Armed Forces), a State or political subdivision of a State, or the government of an Indian tribe to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is *in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to **or prohibiting the sale, distribution, possession, exposure to, access to**, advertising and promotion of, **or use** of tobacco products by individuals **of any age**,* information reporting to the State, or measures relating to fire safety standards for tobacco products. No provision of this subchapter shall limit or otherwise affect any State, tribal, or local taxation of tobacco products.

…

(b) Rule of construction regarding product liability

No provision of this subchapter relating to a tobacco product shall be construed to modify or otherwise affect any action *or* the liability of any person under the product liability law of any State.

21 U.S.C. § 387p (emphases added).[14]

Congress thus made plain what one would otherwise presume: that the states retained broad authority to regulate cigarettes, and specifically, to ban their sale, distribution, possession, or use outright.  Moreover, Congress expressly stated that it did not intend to "affect any action *or* the liability of any person under the product liability of any State." This indicates that Congress did not intend to impair either preexisting tort actions or prospective product liability claims.  Therefore, even assuming that *Engle* product liability verdicts effectively ban all cigarette sales, Congress has expressed its willingness to tolerate both prohibitions and product liability suits alike.  In turn, because Congress has declared that these things are acceptable, one

---

[14]      Moreover, the limited preemption provision in § 387p(a)(2)(A) "does not apply to requirements relating to the sale, distribution, possession… or use of, tobacco products by individuals of any age[.]"  21 U.S.C. § 387p(a)(2)(B).

cannot view *Engle* product liability actions as obstacles to the objectives and purposes of Congress. *See Whiting*, 131 S. Ct. at 1981.[15]

That Congress would preserve the authority of the States to ban cigarettes should be no surprise, because it merely restates the status quo since the turn of the twentieth century. In *Austin v. State of Tennessee*, 179 U.S. 343, *supra*, the Supreme Court acknowledged that cigarettes were "a legitimate article of commerce" sanctioned by federal law, *id.* at 345, but that the States nevertheless had authority to ban their sale, *id.* at 348-50. The Court stated:

> Without undertaking to affirm or deny their evil effects, we think it within the province of the legislature to say how far [cigarettes] may be sold, or to prohibit their sale entirely, after they have been taken from the original packages or have left the hands of the importer, provided no discrimination be used as against such as are imported from other states, and there be no reason to doubt that the act in question is designed for the protection of the public health.

*Id.* at 348-49.

Accordingly, state-law prohibitions on cigarette sales can stand side-by-side with the fact that Congress has tolerated cigarettes and purposefully refrained from banning them.

PM USA cites *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, and *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, for the proposition that federal law impliedly preempts *Engle* product liability claims (Doc. 135 at 18). Both cases are distinguishable. In *Brown & Williamson*, the Supreme Court held "that Congress has clearly precluded *the FDA* from asserting jurisdiction to regulate tobacco products." 529 U.S. at 126 (emphasis added). The Supreme Court explained that if FDA had authority to regulate tobacco products, it would have

---

[15]   I recognize that the Supreme Court has "decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *United States v. Locke*, 529 U.S. 89, 106-07 (2000)). This does not present an issue here, however, because I am not supplying the saving clause with a broad effect; the *text itself* does that. And because the text of the statute preserves state authority to go so far as banning cigarettes, allowing such state action cannot "upset the careful regulatory scheme established by federal law."

been required by statute to ban their sale. *Id.* at 133-35. FDA could not have had jurisdiction over tobacco, the Supreme Court reasoned, because "the collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States." *Id.* at 139. *Brown & Williamson* is not a case about preemption of state law. It is, rather, a case about whether Congress delegated authority to an executive agency to promulgate rules about and regulations relating to tobacco. Such delegation implicates congressional goals for what it wanted *federal* law to achieve or not to achieve.

Preemption, in contrast, relates to principles of federalism. Moreover, *Brown & Williamson*'s discussion of congressional objectives with respect to cigarettes, *id.* at 143-56, supports only the unremarkable contention that *Congress itself* did not wish to remove cigarettes from the national market. It does not support the more extreme inference that Congress intended to displace *state* police powers in regulating cigarettes.[16]

*Geier v. Am. Honda Motor Co.* is also distinguishable. In that case, the plaintiff suffered injuries from a car accident and sued the manufacturer for defective design. The basis for that claim was that Honda had not equipped the vehicle with airbags. 529 U.S. at 865. "The basic question… [was] whether a common-law 'no airbag' action… actually conflicts with [Federal Motor Vehicle Safety Standard] 208." *Id.* at 874.

The Supreme Court held that it did. *Id.* FMVSS 208 "set[ ] a performance requirement for passive restraint devices and allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to

---

[16]     There is no contradiction between Congress deliberately refraining from banning cigarettes while allowing individual states to do just that. Congress knows that a federal ban would sweep broadly, forcing the removal of cigarettes from the market *nationwide*, which may not reflect the will of the people in each state. State and local bans, by contrast, have much more limited reach, and are more likely to reflect the collective judgment of those affected by the ban.

satisfy that requirement." *Id.* at 878.  The Court found that the objective of FMVSS 208 was to "bring about a mix of different devices introduced gradually over time," and that DOT specifically did not want to compel manufacturers to include airbags in all vehicles. *See id.* at 874, 879.  A common-law duty to install airbags in every vehicle would have undone DOT's policy, which years of experience and expertise had informed. *Id.* at 881-82.

In arriving at its conclusion, the Supreme Court traced the "convoluted" history of FMVSS 208 as it evolved throughout the 1960's, 1970's, and 1980's in response to industry feedback and public backlash against various efforts to require certain passive restraint devices. *See id.* at 875-77.  In light of that history, and in light of specific considerations that influenced DOT's decision, *id.* at 877-78, the Supreme Court found that it was DOT's deliberate, carefully-considered objective *not* to require airbags in every vehicle.

Importantly, the Court "place[d] some weight upon DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would stand as an obstacle to the accomplishment and execution of those objectives." *Id.* at 883 (citation omitted) (internal quotation marks and alterations omitted).  The Court noted several factors warranting deference to the DOT's expert view on the matter: "Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive.  The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *Id.* (citation omitted).  The Court stated it had "no reason to suspect that the Solicitor General's representation of DOT's views reflects anything other than the agency's fair and considered judgment on the matter." *Id.* (quotation marks and citation omitted).

Here, in contrast to *Geier*, the subject matter is not as technical, and there is no expert agency advising me that a *de facto* common-law ban on cigarette sales would stand as an obstacle to a congressional objective.  To the contrary, Congress has spoken, and it has consistently expressed, and never declared expressly otherwise, that states may go so far as to enforce rules prohibiting the sale of cigarettes.  21 U.S.C. § 387p(a)(1).

The past several decades have seen Congress choosing to regulate various aspects and activities of the cigarette industry. But Congress has not turned to outright prohibition.  Congress has also expressly preempted some state laws, but only to the extent those laws were limited in scope to such things as labeling and advertising.   That being so, the most reasonable inference I can draw from the course of congressional activity is that *Congress itself* has not decided to outlaw cigarettes.  I cannot draw the more radical inference that Congress also intended to foreclose *the states* from regulating cigarettes more extensively, even to the point of banning them.

I therefore reject PM USA's argument that federal law impliedly preempts Mrs. Berger's negligence and strict liability claims.


### E.  Whether Plaintiff is Entitled to Seek Punitive Damages

Finally, PM USA argues that Mrs. Berger is not entitled to punitive damages as a matter of law.  (Doc. 135 at 19-25).  This argument is moot because I vacated the punitive damages award when I granted PM USA judgment as a matter of law with respect to Mrs. Berger's fraudulent concealment and conspiracy-to-conceal claims.  (Doc. 155 at 27, ¶ 2).  Mrs. Berger has filed a Rule 60(b) motion in an effort to revive the punitive damages award.  (Doc. 190).

That motion is pending, and PM USA may renew its argument if punitive damages are reinstated in some way.

**Conclusion**

For the foregoing reasons, it is hereby

ORDERED THAT

1.   Defendant Philip Morris USA's Motion for Judgment as a Matter of Law on All Claims (Doc. 135) be, and the same hereby is denied as moot in part and denied in remaining part.

2.   Defendant's Motion to Stay (Doc. 191) be, and the same hereby is denied.  *See* p. 10 & FN 9, *supra*.

3.   I will enter a separate order on Defendant's remaining tolling motions (Doc. 139; Doc. 140) simultaneously herewith.


So ordered.

/s/  James G. Carr_____<br>Sr. U.S. District Judge