# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

Bernard Cote, as Personal Representative
of the Estate of Judith Berger,

       Plaintiff,               Case No.:      3:09-cv-14157

v.                                    **ORDER**

Philip Morris USA, Inc.,

       Defendant.

Carr, D.J. [1]

This "*Engle*-progeny"[2] case is before me, once more, on a trio of post-trial motions filed by the Defendant, Philip Morris USA, Inc. The first is Philip Morris's "Renewed Motion for New Trial or in the Alternative Remittitur of the Punitive Damages Award." (Doc. 210). The second is Philip Morris's "Renewed Motion for Judgment as a Matter of Law on Plaintiff's Punitive Damages Claims." (Doc. 211). The third is Philip Morris's "Renewed Motion to Amend the Judgment to Apply Credit for Guaranteed Sum in Accordance with Stipulation." (Doc. 212).

---

[1]      Senior U.S. District Judge, N.D. Ohio, sitting by designation.

[2]      I refer to cases filed pursuant to the Florida Supreme Court's opinion in *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006) (*Engle III*), as "*Engle*-progeny cases." There, the Florida Supreme Court decertified a statewide class of smokers and survivors after a lengthy jury trial on certain global issues, but gave class members one year to file individual lawsuits. *Id.* at 1277. Class members were given the preclusive effect of the "Phase I" jury findings, which established, among other things, that cigarettes are addictive and cause various diseases, that the defendants were negligent, that the defendants fraudulently concealed the addictive and harmful properties of cigarettes, and that the defendants conspired to conceal those properties. *See id.* However, individual plaintiffs still had to prove "(i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes … was a legal cause of the injuries alleged; and (iii) damages." *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 430 (Fla. 2013). For a more detailed history, see *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1326-29 (11th Cir. 2010).

Plaintiff Bernard Cote, as the personal representative of the estate of Judith Berger, has responded to each of the motions. (Docs. 213, 214, 215). For the reasons below, I will deny each of them.

## I.    Background

The original plaintiff in this case, Mrs. Berger, was a former cigarette smoker who developed chronic obstructive pulmonary disorder ("COPD") after decades of smoking. On October 3, 2013, she filed an Amended Complaint against several tobacco companies, including Philip Morris, alleging that their cigarettes were responsible for her COPD. (Doc. 5, Amended Complaint). Mrs. Berger sued the defendants under theories of negligence, strict liability, fraudulent concealment, and conspiracy to conceal.

The case proceeded to a nine-day bifurcated jury trial against Philip Morris. After the first phase of the trial, the jury returned a verdict for Mrs. Berger on each of her theories of liability. (Doc. 92). The jury awarded Mrs. Berger $6.25 million in compensatory damages, though it also found that she was 40% comparatively at fault. (*Id.*).[3] The jury further "f[ound] by clear and convincing evidence that," based on its verdict for Mrs. Berger on her fraudulent concealment and conspiracy-to-conceal claims, "punitive damages [we]re warranted against Philip Morris under the circumstances of this case." (*Id.* at 4).[4] Thus, the case went to a second phase of trial where the jury decided how much in punitive damages to award.[5] Following this second phase, the jury returned a punitive damages verdict of $20,760,000.14. (Doc. 100).

---

[3]    The comparative fault finding did not affect Plaintiff's compensatory recovery because the jury also found for Mrs. Berger on her intentional tort claims. There is no comparative fault reduction to compensatory damages that result from an intentional tort, such as fraudulent concealment or conspiracy to conceal. § 768.81(4), Fla. Stat.

[4]    Unless otherwise indicated, docket citations are to the page number designated by CM/ECF.

[5]    A different judge, the Honorable Sheri Polster Chappell, presided over the punitive damages phase of the trial.

After trial, I denied Philip Morris's motion for remittitur of the damages award and a new trial based on improper closing arguments. (Doc. 197). I also denied Philip Morris's motion for judgment as a matter of law on all claims, in which Philip Morris asserted due process and federal preemption arguments. (Doc. 196). However, I granted Philip Morris judgment as a matter of law on the fraudulent concealment and conspiracy-to-conceal claims for lack of proof. (Doc. 155). Consequently, I vacated the $20.7 million punitive damage award. (*Id.* at 27, ¶ 2).

On appeal, the Eleventh Circuit Court of Appeals affirmed the denial of Philip Morris's motion for remittitur and a new trial based on improper arguments, as well as the rejection of Philip Morris's due process and federal preemption arguments. *Cote v. R.J. Reynolds Tobacco Co.*, 909 F.3d 1094, 1099, 1109 (11th Cir. 2018). But the Eleventh Circuit reversed this Court's order granting Philip Morris judgment as a matter of law on Mrs. Berger's intentional tort claims. *Id.* at 1099, 1109. Thus, the Eleventh Circuit remanded the case with instructions to enter "judgment in Plaintiff's favor on claims for fraudulent concealment and conspiracy to fraudulently conceal and [to reinstate] the jury's corresponding punitive damages award." *Id.* at 1110.

While the case was on appeal, Mrs. Berger passed away and Bernard Cote, as the representative of Mrs. Berger's estate, was substituted as the plaintiff. On January 16, 2019, I entered an amended judgment conforming with the Eleventh Circuit's mandate. (Doc. 209). About a month later, Philip Morris filed the instant trio of motions.

## II.    Renewed Motion for New Trial or in the Alternative Remittitur of the Punitive Damages Award[6]

Philip Morris argues that I should order a new trial because "[t]he punitive damages award in this case is so grossly excessive and unsupported by the evidence that it could only have been the product of passion or prejudice." (Doc. 210 at 14). Philip Morris points to several lines from Plaintiff's closing argument during the first phase of trial, which Philip Morris claims inflamed the passions and prejudice of the jury. (*Id.* at 15-16) (citing Trial Tr. at 2468-71). According to Philip Morris, the allegedly inflammatory comments infected the entire trial, not just the punitive damage verdict, such that a new trial is required on all issues. (*Id.* at 17).

Alternatively, Philip Morris argues that "[t]he punitive damages award … should be vacated, or at minimum reduced to no more than $1 million for three reasons." (*Id.* at 6; *see also id.* at 17). First, Philip Morris argues that the punitive damage award is excessive, in violation of the Fourteenth Amendment's Due Process Clause, because "a lesser amount would suffice to serve the State's legitimate interest in punishment and deterrence." (*Id.* at 6). Philip Morris contends that *no* punitive award is necessary, due to Philip Morris's changed conduct, changed personnel and shareholders, and broad legal restraints on tobacco companies that will purportedly prevent

---

[6]    As a threshold matter, Philip Morris argues that the Eleventh Circuit's mandate does not preclude it from moving for a new trial or for remittitur of the punitive damage award. I agree in part. The Eleventh Circuit did not decide whether the punitive damage award was excessive under the Due Process Clause, *see Cote*, 909 F.3d 1094, and Philip Morris did not raise the issue on appeal. Neither the Eleventh Circuit nor Philip Morris had occasion to address that precise issue because at the time of the appeal, no punitive damage award was pending; I had vacated it in a post-trial order. (Doc. 155 at 27, ¶ 2). I also had denied Philip Morris's initial challenge to the excessiveness of the punitive damage award as moot because of that vacatur. (Doc. 197 at 2). Therefore, it would be unfair to Philip Morris, and an overly broad reading of the Eleventh Circuit's opinion, to find that the mandate precludes Philip Morris from challenging the punitive damages as excessive. Therefore, to the extent Philip Morris argues that the punitive damage verdict is excessive under the Due Process Clause, I do not interpret the Eleventh Circuit's mandate as barring that challenge.
    However, as discussed below, I do find that Philip Morris's request for a new trial on all issues based on improper closing arguments is barred by the mandate rule.

repetition of the conduct at issue in the *Engle* cases. (*Id.* at 6-7, 7-10). Philip Morris also argues that I should consider the cumulative effect of all punitive damage awards, reasoning that $20 million is excessive because if all 2,700 *Engle* plaintiffs received that much in punitive damages, the total would exceed $50 billion. (*Id.* at 10). Second, Philip Morris argues that "the award here is inconsistent with the Supreme Court's guidance that punitive damages should not exceed, and in appropriate cases may be less than, compensatory damages where the jury has returned a substantial compensatory damages award." (*Id.* at 7; *id.* at 11-13). Third, Philip Morris argues that "there is an impermissible risk that the punitive award in this case reflects punishment for harm to persons other than Plaintiff." (*Id.* at 7; *see also id.* at 13).

## A. Standard

A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

> A losing party may ... move for a new trial under Rule 59 on the grounds that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair ... and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."

*McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). Thus, under Rule 59(a), a district court may grant a new trial "if in [the court's] opinion, the verdict is against the clear weight of the evidence ... or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)). A district court's decision whether to grant or deny a motion for a new trial is reviewed for abuse of discretion. *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247 (11th Cir. 2001). However, a district court's decision whether the award of punitive

damages violates due process is reviewed *de novo*. *Goldsmith v. Bagby Elevator Co., Inc.*, 513

F.3d 1261, 1275-76 (11th Cir. 2008) (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,

532 U.S. 424, 443 (2001)).

### B.  This Court Will Not Grant a New Trial

Philip Morris argues that a new trial on all issues is required because Plaintiff's closing

statements in the first phase of the trial inflamed the jury's passions. (Doc. 210 at 14-17).

Specifically, Philip Morris argues that Plaintiff's closing remarks invited the jury to award punitive

damages based on harm or misconduct involving nonparties. The statements include the following:

-   And the truth of the matter is that this conspiracy, this product has killed
    grandfathers, grandmothers …. they have killed aunts and uncles, mommies
    and daddies, they have killed sisters and brothers. And when – you make no
    mistake, and we have shown you the evidence that the replacement smokers are
    kids.

(Trial Tr. at 2470-71).

-   Dr. Proctor told you the 2014 Surgeon General's report says that 480,000
    people die every year of cigarette disease.

(*Id.* at 2469).

-   Mr. Jupe agreed when he came on video that [smoking] kills 400,000 people
    every year; that's what Mr. Jupe said. That's 400,000 people, 480,000 people,
    it's about 40,000 every month. The population of Fort Myers[, Florida] is
    60,000, that wipes out Fort Myers in less than two months.

(*Id.* at 2470).

-   The other thing I want you to consider is the targeting to children. Dr. Proctor
    – it rhymes – Dr. Proctor, said what they did from the 20's and on even he said
    about targeting children because what did they know? 90 percent, over 90
    percent of daily smokers start in their teenage years. They're studying 14-year
    olds and younger.

    We showed you some documents with 12-year olds they're studying. They're
    doing surveys, where did they go, is this what in this society we expect
    companies to do when they're selling a dangerous product? Let's go find
    children at schools, soda fountains, recreation areas, parks, bowling alleys,
    beaches, lakes, and then the document tells you why, why is that a good place?

> Why? Because their parents won't be there. Is that the kind of conduct that we
> need to deter? Is that the kind of conduct that we need to stop?

(*Id.* at 2468-69). Additionally, Philip Morris takes exception to a remark in which Plaintiff's

counsel allegedly compared the company to a child predator:

> You know, when a kid – if a kid takes a piece of candy from a stranger and then
> goes and gets hurt, you know, because mommy and daddy told them don't ever
> accept candy from a stranger, and then it happens and they go get hurt ….
>
> ***
>
> The kid accepts candy from a stranger and then gets hurt. Okay? We don't blame
> that kid because they didn't listen to mommy and daddy; we blame the party that
> deserves the blame.

(*Id.* at 2540, 2541). Philip Morris contends that Plaintiff's arguments excited the jury's passions,

and that the excessiveness of the punitive damages verdict itself is evidence that the jury was

prejudiced. Philip Morris argues that the appropriate remedy is a new trial on all issues, including

class membership, causation, reliance, comparative fault, and compensatory and punitive damages.

(Doc. 210 at 16-17).

To the extent Philip Morris asserts that Plaintiff's closing arguments require a new trial on

all issues, that argument is barred under the mandate rule. "The mandate rule is a specific

application of the 'law of the case' doctrine which provides that subsequent courts are bound by

any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the

same case." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 843 (11th Cir. 2018)

(quotation marks omitted). "The law of the case doctrine and the mandate rule ban courts from

revisiting matters decided expressly or by necessary implication...." *Id.* (quotation marks omitted).

It has its greatest force when a case is on remand to the district court. *Id.* When a district court acts

under the mandate of an appellate court, the district court "cannot vary it, or examine it for any

other purpose than execution; or give any other or further relief; or review it, even for apparent

error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded." *Id.* (quotation marks omitted).

In the prior appeal, the Eleventh Circuit affirmed this Court's denial of Philip Morris's previous motion for a new trial based on improper closing arguments. *Cote*, 909 F.3d at 1104-05, 1109. The Eleventh Circuit considered and rejected Philip Morris's claim that Plaintiff's counsel made remarks during closing or rebuttal argument that were so prejudicial as to require a new trial. *Id.* at 1104-05. Indeed, one of the arguments to which Philip Morris now objects – where Plaintiff's counsel allegedly compared the company to a child predator – is identical to one that the Eleventh Circuit analyzed and found not to be unwarranted. *Id.* While the rest of the remarks that Philip Morris now objects to were *not* raised on direct appeal, such as counsel's comment that smoking-related diseases kill 480,000 people per year, a party cannot bypass the mandate rule by raising new arguments for the first time after remand. *See United States v. Mesa*, 247 F.3d 1165, 1170-71 (11th Cir. 2001) (affirming a district court's refusal to consider a defendant's new argument raised for the first time at resentencing following remand). If Philip Morris wished to argue that Plaintiff's mention of the number of smoking-related fatalities was so prejudicial as to warrant a new trial, it should have included that argument in its initial round of post-trial motions and raised it on appeal. Accordingly, to the extent Philip Morris argues that Plaintiff's closing arguments require a new trial on all issues, that argument is foreclosed by the Eleventh Circuit's prior opinion.[7]

---

[7]    Alternatively, I reject Philip Morris's argument that the Plaintiff's closing remarks require a new trial. "A new trial is seldom warranted because of counsel's remarks during closing argument. Indeed, the Eleventh Circuit has clearly expressed a 'reluctan[ce] to set aside a jury verdict because of an argument made by counsel during closing arguments.'" *Ocean View Towers Ass'n, Inc. v. QBE Ins. Corp.*, No. 11-60447-Civ., 2012 WL 882577, at *2 (S.D. Fla. Mar. 15, 2012) (quoting *Vineyard v. Cnty. of Murray, Ga.*, 990 F.2d 1207, 1214 (11th Cir. 1993)). Viewing the record as a whole, I do not find that Plaintiff's comments were "plainly unwarranted and clearly injurious." *Peterson v. Willie*, 81 F.3d 1033, 1036 (11th Cir. 1996). It was relevant for Plaintiff to introduce some evidence regarding harm to nonparties as it related to the reprehensibility of Philip

Philip Morris also argues that the excessiveness of the punitive damage award itself is evidence that Plaintiff's arguments excited the jury's passions. However, this argument fails because, as discussed below, the punitive damages were not excessive.

### C. The Punitive Damage Award is Not Excessive[8]

As an alternative to a new trial, Philip Morris argues that I should vacate or reduce the punitive damage award because it is excessive. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996) (citations omitted). However, "[t]he Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a grossly excessive punishment on a tortfeasor." *Id.* at 562 (internal quotation marks and citation omitted). "Only when an award can fairly be categorized as 'grossly excessive' in relation to [the State's] interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 568 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 456 (1993)). A court reviewing a punitive damage award must consider three "guideposts": (1) "the degree of reprehensibility of the defendant's misconduct"; (2) "the disparity between the

---

Morris's conduct. *Action Marine Inc. v. Continental Carbon, Inc.*, 481 F.3d 1302, 1320 (11th Cir. 2007) (citing *Philip Morris USA v. Williams*, 549 U.S. 346, 353-55 (2007)).

Additionally, there is no evidence that the remarks prejudiced the jury against Philip Morris. The comments to which Philip Morris objects all occurred during the first phase of trial. After the first phase, the jury awarded Mrs. Berger $3.75 million less in compensatory damages than she requested (*compare* Trial Tr. at 2463 *with* Doc. 92), and also found that Mrs. Berger was 40% at fault (Doc. 92). Such a verdict does not suggest that Plaintiff's closing arguments "impair[ed] gravely the calm and dispassionate consideration of the case by the jury." *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988) (internal quotation marks and citation omitted).

[8] Philip Morris does not argue that the punitive damage award is excessive under Florida law. Rather, Philip Morris argues that the punitive damages are excessive under the Fourteenth Amendment's Due Process Clause and United States Supreme Court precedent. Accordingly, I will analyze Philip Morris's arguments under those standards.

actual or potential harm suffered by the plaintiff and the punitive damages award"; and (3) "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). But these guideposts are not an "analytical straitjacket." *Action Marine*, 481 F.3d at 1318 (quoting *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 81 (1st Cir. 2001)). The "overarching aim [is] eliminating the risk that a defendant is punished arbitrarily or without fair notice of the possible consequences of its actions." *Id.*

The first guidepost – reprehensibility – is the "most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). *See also McGinnis v. Am. Home Mortgage Servicing, Inc.*, 901 F.3d 1282, 1288 (11th Cir. 2018) ("The reprehensibility of the defendant's conduct is the 'dominant consideration' in assessing whether a jury's punitive damages award is excessive.") (citing *Goldsmith*, 513 F.3d at 1283). "The reprehensibility determination 'must begin with the identification of the state's interest and an assessment of the strength of that interest,' which are questions of law." *Action Marine*, 481 F.3d at 1319 (citing *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1334 (11th Cir. 1999)). From there,

> [t]o determine reprehensibility, the Supreme Court has instructed courts to consider several sub-factors: (1) whether the harm caused was physical or economic; (2) whether the conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions rather than an isolated event; and (5) whether the conduct involved intentional malice, trickery, or deceit rather than mere accident.

*McGinnis*, 901 F.3d at 1288 (citing *State Farm*, 538 U.S. at 419). "While there is no requirement that a certain number of the five *State Farm* factors be present in order to support a finding of

reprehensibility, reprehensibility grows more likely as more factors are present." *Myers v. Cent. Fla. Investments, Inc.*, 592 F.3d 1201, 1219 (11th Cir. 2010) (citing *State Farm*, 538 U.S. at 419).

I begin by identifying Florida's interest in imposing punitive damages and the strength of that interest. *Action Marine*, 481 F.3d at 1319. There can be no doubt that Florida has an interest in deterring companies from selling addictive and unreasonably dangerous products to consumers, as Philip Morris and other tobacco companies did here. The State also has an interest in punishing actors, like Philip Morris, who fraudulently conceal those same properties from the consumer. And the State has a special interest in punishing actors, like Philip Morris, who target vulnerable and impressionable citizens in their marketing campaigns – such as adolescents – so as to create a captive consumer base by getting them addicted to their products at a young age. Given the devastating personal and public health consequences that followed, Florida's interest in punishing and deterring such behavior is significant.

Turning to the reprehensibility analysis, four of the five *State Farm* factors weigh clearly against Philip Morris. First, the harm that Philip Morris caused Mrs. Berger was both physical and economic. The jury heard extensive testimony about how Mrs. Berger suffered from severe COPD as a result of smoking Philip Morris's cigarettes. (Trial Tr. at 1152-68, 1284-1302). The jury saw that Mrs. Berger was bound to a wheelchair and tethered to an oxygen tank. One of Mrs. Berger's physicians, Dr. Layish, testified at the trial in September 2014 that COPD had shortened Mrs. Berger's life expectancy and that she would only live for another three to five years. (*Id.* at 1460). Sadly, Dr. Layish was right. Mrs. Berger died in 2017 while the appeal in this case was still pending. Second, Philip Morris's conduct is a classic example of "evinc[ing] an indifference to or a reckless disregard of the health or safety of others." *State Farm*, 538 U.S. at 419. The jury heard testimony that executives for Philip Morris and other cigarette makers knew, based on internal

research, that their products were addictive and hazardous. Not only did Philip Morris continue marketing its products anyway, it sought to suppress this information by "engag[ing] in a massive and effective disinformation campaign, aimed at instilling false doubt about scientific research linking cigarette smoking and deadly disease." *Cote*, 909 F.3d at 1101. In doing so, Philip Morris displayed conscious disregard for the health and safety of its consumers. Third, the plaintiff's financial vulnerability is not a factor that weighs in favor of either side, but I note that Philip Morris had and still has vastly more financial resources than Mrs. Berger did. Fourth, Philip Morris's "conduct involved repeated actions." *State Farm*, 538 U.S. at 419. The evidence showed that Philip Morris and other tobacco companies engaged in a long-running pattern of fraudulent concealment, waging a concerted disinformation campaign that began in the 1950's and continued for decades thereafter. *Cote*, 909 F.3d at 1101. Philip Morris's behavior was no isolated incident.

Fifth, Philip Morris's conduct involved "intentional malice, trickery, or deceit rather than mere accident." *State Farm*, 538 U.S. at 419. Indeed, two of the *Engle* Phase I findings were "that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading[,] or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes[,] or both," and "that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment." *Engle III*, 945 So. 2d at 1277. Moreover, the jury heard evidence that not only did Philip Morris seek to conceal information about the harmful properties of its cigarettes, it went so far as to promote false distraction science aimed at creating doubt in consumers' minds about whether cigarettes were harmful. *Cote*, 909 F.3d at 1101; (*see also* Doc. 155 at 4-5). According to a damning Tobacco Institute memo from 1969: "Doubt is our product. Since it is the best means

of competing with the body of fact that exists in the mind of [the] general public. It is also the means of establishing a controversy." (*See* Trial Tr. at 664). Philip Morris's disinformation campaign succeeded in sowing false doubt in Mrs. Berger's mind. The Eleventh Circuit recounted her testimony:

> As a teen, Mrs. Berger knew nothing about nicotine. She remembered reading the Surgeon General's warning on cigarette packages that appeared in 1966, when she was twenty-two, and recalled the exact wording: "Cigarette smoking may be hazardous to your health." She testified that at the time, she and her friends thought "they weren't sure" about the health hazards associated with cigarettes, and "they were speculating." She testified that nobody took the warning seriously because "[t]hey were working on it, but it wasn't a sure thing yet," and that she knew people in their nineties who were still smoking.

*Cote*, 909 F.3d at 1102. On top of that, Philip Morris targeted youths as part of its marketing strategy. As I recounted in an earlier post-trial order:

> Beginning when and as she did, as a young and impressionable teenager induced by friends, the evidence at trial showed Mrs. Berger to be entirely typical of those whom tobacco companies deliberately targeted as prospective customers. Tobacco companies knew they needed to gain new customers when they were young, as those who were non-smokers by their twenties would, in all likelihood, never become their customers. Tobacco companies consequently deliberately targeted persons of school and college age to begin smoking, knowing that, as a result of the addictive powers of their product, and the oft irresistible influence of peer pressure on pupils and students, they would acquire new, life-long consumers of their products.

(Doc. 155 at 3). The record is replete with evidence that Mrs. Berger's harm resulted from Philip Morris's "intentional malice, trickery, [and] deceit." *State Farm*, 538 U.S. at 419. Philip Morris's conduct was more than merely accidental, it was devious and "among the most reprehensible." *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 307 (Fla. 2017).

Turning to the second guidepost, I do not find that "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award" is excessive. *State Farm*, 538 U.S. at 418. The jury awarded Mrs. Berger $20.7 million in punitive damages and $6.25

million in compensatory damages, resulting in an approximate ratio of 3.3 to 1. Philip Morris makes much of this ratio, seizing on dicta from *State Farm* to argue that "[w]here a compensatory award is 'substantial,' then a 'ratio … perhaps only equal to compensatory damage[ ] can reach the outermost limit of the due process guarantee.'" (Doc. 210 at 11) (quoting *State Farm*, 538 U.S. at 425). But Philip Morris ignores the very next sentence in *State Farm*, which states that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm,* 538 U.S. at 425. Indeed, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582 (emphasis omitted). In contrast to *Gore* and *State Farm*, Philip Morris's conduct here resulted in physical harm to the plaintiff and satisfied nearly every reprehensibility factor, justifying a larger punitive damage award. Additionally, the Supreme Court has indicated that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425. The 3.3 to 1 ratio in this case is nothing like the staggering ratios in other cases where the Supreme Court struck down the punitive damage award as excessive. *Compare Williams*, 549 U.S. 346 (striking down $79.5 million punitive damage award where compensatory damages were $821,000, or a nearly 100 to 1 ratio); *State Farm*, 538 U.S. 408 (striking down $145 million punitive damage award where compensatory damages were $1 million, or a 145 to 1 ratio); *Gore*, 517 U.S. 559 (striking down $2 million punitive damage award where compensatory damages were only $4,000, or a 500 to 1 ratio). The 3.3 to 1 ratio in this case fits in comfortably with other cases where similar ratios were found to comport with due process, even though compensatory damages were already substantial, taking into account the reprehensibility of the defendant's

conduct. *See*, *e.g.*, *Action Marine*, 481 F.3d at 1321-22 (upholding $17.5 million punitive damage award where compensatory damages were $3.2 million, or a 5.5 to 1 ratio, where a manufacturer of carbon black failed to address complaints that its emissions were damaging nearby properties, misled the public, tried to evade accountability, and the product was a suspected carcinogen); *Schoeff*, 232 So. 3d at 307 (upholding $30 million punitive damage award, which was three times the amount of compensatory damages in an *Engle* progeny case). Therefore, I do not find the 3.3 to 1 ratio to be excessive.

The third and final guidepost is "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. This guidepost "is accorded less weight in the reasonableness analysis than the first two guideposts." *Action Marine*, 481 F.3d at 1322 (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004)). Still, I observe that in Florida "[i]n comparable cases, the civil penalty is often three times the compensatory award." *Schoeff*, 232 So. 3d at 308 (citing § 768.73(1)(a)1, Fla. Stat. (2011)). The 3.3 to 1 ratio in this case is sufficiently close to the 3-to-1 ratio described above that this guidepost weighs in favor of sustaining the punitive damage award.[9]

Having examined each of the *Gore* guideposts, I find that the punitive damage award was not excessive. To recap, (1) Philip Morris's conduct was easily in the upper range of reprehensibility, (2) the 3.3 to 1 ratio of punitive damages to compensatory damages is reasonable,

---

[9]     Courts in Florida have also upheld punitive damage verdicts that exceeded the 3 to 1 ratio. *R.J. Reynolds Tobacco Co. v. Buonomo*, 138 So. 3d 1049, 1052-53 (Fla. 4th DCA 2013) (finding that $25 million punitive damage award was not unconstitutionally excessive where compensatory damages were $5.235 million, or a 4.78 to 1 ratio), *quashed on other grounds*, No. SC14-81, 2016 WL 374082 (Fla. Jan. 26, 2016); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1071-72 (Fla. 1st DCA 2010) (upholding $25 million punitive damage award where compensatory damages were $3.3 million, or a 7.58 to 1 ratio).

and (3) the punitive damages here are comparable to the civil penalties assessed in similar cases under Florida law.

Philip Morris raises three other arguments that merit some discussion. First, Philip Morris argues that no punitive damage award is necessary to advance the State's interest in punishment and deterrence. Philip Morris asserts that broad new legal restraints on tobacco companies will prevent repetition of the conduct involved in the *Engle* cases, and that punitive damages will only punish Philip Morris's current personnel and shareholders, not the individuals originally culpable. Philip Morris's argument that new legal restraints will prevent repetition is unconvincing. Fraudulent concealment has long been unlawful,[10] but that did not stop Philip Morris from deceiving Congress, regulators, and the public about the addictive and hazardous characteristics of cigarettes. Philip Morris offers no convincing reason why *new* legal restraints are guaranteed to prevent further intentional misconduct, such that punitive damages are an unnecessary deterrent. "Next, the fact that the [tortious] policies at issue were put in place by natural persons no longer associated with [Philip Morris] and who [will] not feel the force of the punitive damage award ignores the corporate form." *Burkhart v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-10727-WGY-HTS, 2014 WL 12616121, at *2 (M.D. Fla. Sep. 16, 2014), *aff'd*, 884 F.3d 1068 (11th Cir. 2018).

> A corporation acts with equal culpability whenever any of its officers acts on its behalf. The liability does not disappear when the natural person who acted on the corporation's behalf departs the corporation. Defendants' citation to a concurring opinion where one judge suggested giving a corporation the benefit of the above argument is weak. *See Baione v. Owens–Illinois, Inc.*, 599 So. 2d 1377, 1378, 1380 (Fla. Dist. Ct. App. 1992) (Altenbrand, J., concurring). Defendants' argument, if accepted, would apply with equal force to compensatory awards against corporations and would create an informal statute of limitations based on the longevity of a corporation's personally culpable officers or employees. Again, that

---

[10]    *See, e.g.*, *Croyle v. Moses*, 90 A. 250, 35 Am. Rep. 654 (Pa. 1879) (fraudulent concealment involving a horse); *Pickering v. Dowson*, 4 Taunt. 779, 128 Eng. Rep. 537 (1813) (holding defendant liable for fraudulent concealment where defects in a house were covered with plaster and paint).

theory is contrary to law and grossly misapprehends the core purposes of the corporate form.

*Id.* Thus, punitive damages still serve the State's interest in punishment and deterrence.

Second, Philip Morris argues that I must consider the cumulative effect of the punitive damage award. Philip Morris reasons that a $20 million punitive damage verdict is excessive because if all 2,700 *Engle* plaintiffs received that much in punitive damages, the total would exceed $50 billion. That is not part of the analysis under *Gore* and *State Farm*, but the argument lacks merit in any event. The argument is speculative because there is no evidence or realistic probability that Philip Morris will have to pay $20 million in punitive damages in *every* one of the 2,700 *Engle* cases. *See Schoeff*, 232 So. 3d at 307 (rejecting a similar argument by R.J. Reynolds). Philip Morris's argument is also inconsistent with *State Farm*, which instructs courts to assess the reasonableness of a punitive damage award "based upon the facts and circumstances of the defendants' conduct and the harm to the plaintiff," *State Farm*, 538 U.S. at 425, not based on the aggregate effects of a punitive damage award.

Third, Philip Morris argues that "there is an impermissible risk that the punitive award in this case reflects punishment for harm to persons other than Plaintiff." (Doc. 210 at 7). Philip Morris points to various closing arguments by Plaintiff's counsel, where he discussed the number of smoking-related fatalities and Philip Morris's marketing strategy of targeting youths. It is true that "punitive damages may not be awarded to punish for harm inflicted on nonparties." *Action Marine*, 481 F.3d at 1320 (citing *Williams*, 549 U.S. at 353-55). However, a jury "may consider the risk of harm to others as part of the reprehensibility analysis." *Id.* (citing *Williams*, 549 U.S. at 353-55). Indeed, "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Williams*, 549 U.S. at 355; *see also Goldsmith*, 513 F.3d at 1283

(observing that the defendant's "pattern of retaliatory and discriminatory misconduct," including against three other employees who had filed charges of discrimination, was a factor that supported a finding of reprehensibility). "[C]onduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. *And a jury consequently may take this fact into account in determining reprehensibility*." *Williams*, 549 U.S. at 357 (emphasis added) (citation omitted). Accordingly, it was relevant for Plaintiff to introduce some evidence regarding Philip Morris's campaign of marketing to adolescents and the devastating public health consequences of concealing the hazardous properties of cigarettes.

Equally important is that the Court ensured through its instructions that the jury would not use punitive damages to punish Philip Morris for harm inflicted on nonparties. *See Cote*, 909 F.3d at 1105 ("potentially prejudicial remarks 'may be rendered harmless by a curative instruction.'") (citation omitted). At the start of the second phase of trial, the Court carefully instructed the jury about how to consider evidence regarding harm to third parties and the need to tailor the amount of punitive damages based on the specific conduct that injured Mrs. Berger:

> If you decide to assess punitive damages against Philip Morris, you may consider all of the evidence presented during the trial with respect to the scope, effect, and reprehensibility of the defendant's fraudulent misconduct, but the amount you award must be limited to the damage you find by a preponderance of the evidence to have been suffered by plaintiff Judith Berger … and legally caused by such fraudulent misconduct.
>
> *You may not award punitive damages for any harm that may have been suffered by persons or parties other than Mrs. Berger.*
>
> With regard to the amount of punitive damages to be assessed against Philip Morris, you should consider, one, the nature, extent, and degree of Philip Morris's fraudulent misconduct; two, any mitigating behavior of Philip Morris, and whether there is a continuing need for punishment and/or deterrence; and three, Philip Morris's net worth.

*You have heard evidence concerning harms suffered by persons who are not parties to this case. You may not impose punitive damages to punish Philip Morris for harms caused to those other individuals.*

Other individuals who have been harmed can bring their own suits and seek compensatory and punitive damages in their own right.

*You may only impose punitive damages for the fraudulent misconduct shown by clear and convincing evidence to have caused Mrs. Berger's COPD.*

You may consider evidence concerning harms allegedly suffered by persons who are not parties to this case for the limited purpose of any light it might shed on the degree of blameworthiness of Philip Morris's fraudulent misconduct that may have caused Mrs. Berger's COPD.

You may only consider evidence of conduct that caused harm to persons other[ ] than Mrs. Berger to the extent it was substantially similar to the fraudulent misconduct that you found to be a legal cause of Mrs. Berger's COPD, such that it essentially replicated that conduct.

In determining the amount of punitive damages to be awarded against Philip Morris, if any, you may punish Philip Morris only for injury caused to Mrs. Berger by the specific conduct of Philip Morris that was the basis for your findings that Philip Morris is liable to Mrs. Berger on her claims involving fraudulent concealment and conspiracy to fraudulent conceal.

(Trial Tr. at 2651-53) (emphasis added). The Court repeated these instructions at the end of the second phase as well. (*Id.* at 2853-55). These instructions are consistent with the Supreme Court's teaching that while a jury cannot assess punitive damages to punish for harm inflicted on nonparties, a jury may consider harm to others in measuring the reprehensibility of the defendant's conduct, *Williams*, 549 U.S. at 355, 357, and that if there is any risk of confusion, a court must provide some type of procedural safeguard against that risk, *id.* at 357. I presume that the jury followed the detailed instructions given, *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012), and no evidence leads me to think otherwise. Therefore, I reject Philip Morris's argument that there is an impermissible risk the jury awarded punitive damages to punish Philip Morris for harm to nonparties.

The $20.7 million punitive damages verdict is not unconstitutionally excessive under the Fourteenth Amendment's Due Process Clause. As such, Philip Morris's request for vacatur or a reduction of the punitive damage award is denied.

### III. Renewed Motion for Judgment as a Matter of Law on Plaintiff's Punitive Damages Claims

Philip Morris's next post-trial motion is for judgment as a matter of law on Plaintiff's punitive damages claims. (Doc. 211). Philip Morris argues that Plaintiff cannot rely on the *Engle* Phase I findings to establish liability for punitive damages. (*Id.* at 4-8). Philip Morris also argues that Plaintiff cannot use independent evidence, either by itself or in combination with the *Engle* Phase I findings, to establish liability for punitive damages. (*Id.* at 9-11). In other words, Philip Morris argues that Plaintiff cannot obtain punitive damages under any circumstance. Philip Morris argues that the independent evidence is insufficient to support a finding that punitive damages are warranted; that relying on independent proof alone would threaten to impose punitive damages based on conduct different from that which supported compensatory damages; and that a hybrid approach – combining independent proof with the *Engle* Phase I findings – would present a reexamination problem under the Seventh Amendment to the United States Constitution.

### A. Standard

The standard for granting a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is the same as the standard for granting the pre-submission motion under Rule 50(a). *Chaney v. City of Orlando, Fla.,* 483 F.3d 1221, 1227 (11th Cir. 2007) (citation omitted). Under that standard, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Id.* A court "should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v.*

*Home Shopping Network, Inc.,* 369 F.3d 1189, 1192 (11th Cir. 2004). Ultimately, the jury's verdict must remain intact "if there is evidence from which [the jury] ... reasonably could have resolved the matter the way it did." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1264 (11th Cir.2008).

## B. Philip Morris is Not Entitled to Judgment as a Matter of Law

To be entitled to punitive damages under Florida law, a plaintiff must "prove by clear and convincing evidence the defendant is guilty of intentional misconduct or gross negligence." *Martin*, 53 So. 3d at 1070 (citing § 768.72(2), Fla. Stat.). To establish a corporation's direct liability for punitive damages, a plaintiff must show that a managing agent engaged in reckless or intentional misconduct. *See* Fla. Std. Jury Instr. (Civ.) PD 1*a(3)(a)* (causes of action arising before October 1, 1999).

An *Engle*-progeny plaintiff may not rely solely on the *Engle* findings to establish her right to punitive damages because the *Engle* Phase I jury did not determine whether the defendants were liable for punitive damages to any individual under the clear and convincing evidence standard. Instead, each *Engle* plaintiff must prove her right to recover punitive damages based on the evidence she presents at trial. *See Soffer II*, 187 So. 3d at 1228 ("In other words, once the punitive damages award was vacated by this Court, any individual plaintiff was back to square one on the issue of punitive damages."). Therefore, I accept the argument that an *Engle* plaintiff may not rely on the *Engle* Phase I findings *alone* to establish a right to punitive damages.

However, that is not what happened here. Mrs. Berger's case for punitive damages did not rest solely on the *Engle* Phase I findings. Instead, Mrs. Berger introduced ample independent evidence showing that Philip Morris engaged in intentional misconduct. And contrary to Philip Morris's contention that the independent proof was insufficient, it was enough that a reasonable

jury could conclude that, under the clear and convincing evidence standard, Philip Morris engaged in willful misconduct. The following are some examples of the evidence Mrs. Berger introduced at trial and how it related to her:

- Philip Morris knew that cigarette smoke caused diseases like lung cancer and COPD, but intentionally concealed such information. (Trial Tr. at 590-92, 642-50). Philip Morris also knew that carcinogenic agents could not be removed from cigarettes, yet the company falsely assured the public that if it ever found cigarettes to be harmful, it would remove their products. (*Id.* at 672-77).

- Philip Morris and several other cigarette makers founded the Tobacco Industry Research Committee (TIRC) as a front for disseminating misinformation and distraction science, with the goal of discrediting scientific evidence showing that cigarette smoke poses serious health risks. (*Id.* at 654-61, 664, 844-49); *see also Cote*, 909 F.3d at 1101 ("[T]he jurors in this case heard extensive evidence that beginning in the early 1950's and for decades that followed, Philip Morris and other tobacco companies engaged in a massive and effective disinformation campaign, aimed at instilling false doubt about scientific research linking cigarette smoking and deadly disease."). Philip Morris's campaign to instill false doubt worked as planned on Mrs. Berger. Despite seeing the Surgeon General's warnings on cigarette packages in the 1960's and 1970's, she did not take the warnings seriously because she believed the warnings were not "a sure thing yet," that public health authorities were only speculating, and that "[t]hey were working on it." (Trial Tr. at 1280, 1339).

- In response to mounting evidence that cigarettes are harmful, Philip Morris, through the Tobacco Institute and other front groups, dismissed the evidence as unfounded and mocked public health authorities as "extremist" or "alarmist." (*Id.* at 781-87, 815-17).

- Based on internal research dating back to the 1940's and 1950's, Philip Morris and other cigarette makers knew that nicotine was addictive. (*Id.* at 1657-58, 1668-74). The tobacco companies also knew that the public was unaware of this fact. (*Id.* at 1657-58). Yet Philip Morris and the rest of the tobacco industry kept the public in the dark. In 1988, when the Surgeon General finally reported that nicotine was addictive, Philip Morris and other companies immediately attacked the Surgeon General's conclusions as "irresponsible," "scare tactics," and politically motivated. (*Id.* at 1879-82). But all the while, the cigarette companies designed cigarettes to maximize addictiveness. (*Id.* at 1609-10, 1878-79). Mrs. Berger testified that when she began smoking in the 1960's, she did not know what nicotine was or that the substance was addictive. (*Id.* at 1279). When she first tried to quit smoking in the 1980's, she realized she had become "a slave to it." (*Id.* at 1278). But because of the strong cravings and

urges, as well as the anxiety and irritability she felt when she tried to quit, she struggled to go longer than three days without a cigarette. (*Id.* at 1278-83).

- Internal company documents revealed that Philip Morris designed a marketing strategy that targeted adolescents, knowing that 90% of smokers start in their youth. (*Id.* at 593, 905, 1778). For example, the companies designed mild cigarettes to appeal to "beginning smokers" and "pre-smokers." (*Id.* at 853-54, 897-98). The tobacco companies also conducted marketing surveys of high schoolers and sent surveyors to "young people's hangouts, such as soda fountains, recreation areas, parks, bowling alleys, beaches, [and] lakes." (*Id.* at 2469). Philip Morris's marketing strategy sought to lure young people into smoking by leveraging peer pressure, knowing it could exploit adolescents' need for acceptance. (*Id.* at 1421-24). This effective youth marketing strategy ensnared Mrs. Berger, who began smoking at age 14 and was a daily smoker by age 16. (*Id.* at 1270).

Moreover, Mrs. Berger introduced evidence that tied Philip Morris's misconduct to senior officials. The following are some examples:

- In December 1953, after the American Tobacco Company completed an internal experiment showing that tobacco smoke itself causes lung cancer, the president of every major cigarette manufacturer (except Liggett Group) attended a meeting at the Plaza Hotel in New York City. (*Id.* at 637-38, 654-55). There, the heads of the tobacco industry, including Philip Morris, agreed to create what would become the TIRC. The TIRC's aim was to promote distraction science that would deflect the blame for rising rates of lung cancer onto other causes, such as radon, viruses, genetics, and occupation. (*Id.* at 654-61).

- In 1954, following the American Tobacco Company's secret study, Philip Morris's Vice President of Marketing, George Weissman, gave a public speech "on behalf of our officials at Philip Morris" in which he assured the audience that if cigarettes were ever shown to cause harm, Philip Morris would stop producing cigarettes and would shut down. (*Id.* at 672-73).

- In 1971, Joseph Cullman, III, the president and CEO of Philip Morris and the chairman of the Tobacco Institute, appeared in an interview on broadcast television, where he denied that cigarettes are harmful. (*Id.* at 803). Cullman further promised to eliminate "any ingredient in cigarette smoke [that] is identified as being injurious to human health." (*Id.*).

- In 1972, Philip Morris's Vice President of Public Relations, James Bowling, reiterated in an interview that if cigarettes were found to be harmful, Philip Morris would stop making them. (*Id.* at 821).

Thus, Mrs. Berger introduced sufficient evidence directly implicating Philip Morris's senior officials in its willful misconduct. But even if Mrs. Berger had not introduced such direct evidence, the jury could reasonably have concluded that much of Philip Morris's fraudulent behavior, such as promoting the TIRC's distraction "science," suppressing information about the addictive and harmful properties of cigarettes, and devising a marketing strategy that targeted youths, could only have been the result of executive-level decision making. Thus, the proof was sufficient to allow a reasonable jury to conclude, under the clear and convincing evidence standard, that Philip Morris engaged in willful misconduct relative to Mrs. Berger and that Philip Morris's senior executives were responsible.

Philip Morris also argues that Plaintiff *cannot* rely on independent evidence, either by itself or in combination with the *Engle* findings, to establish that punitive damages are warranted. (Doc. 211 at 9, 10-11). Philip Morris argues that Plaintiff cannot rely on independent proof "[b]ecause any compensatory damages award would be based in large part upon the Phase I findings, and there would be no way to know what conduct was found to be tortious by the *Engle* jury." (Doc. 211 at 10). Thus, the argument goes, "it is impossible to ensure that punitive damages would be imposed for the same conduct that underlies any compensatory damages liability." (*Id.*). Philip Morris's theory has two flaws. First, the Court instructed the jury at length that it could only award punitive damages based on the same conduct that harmed Mrs. Berger. (Trial Tr. at 2651-53, 2853-55). Specifically, the Court instructed the jury that

> [i]n determining the amount of punitive damages to be awarded against Philip Morris, if any, you may punish Philip Morris only for injury caused to Mrs. Berger by the specific conduct of Philip Morris that was the basis for your findings that Philip Morris is liable to Mrs. Berger on her claims involving fraudulent concealment and conspiracy to fraudulent conceal.

(*Id.* at 2652-53; *see also id.* at 2855). Mrs. Berger introduced substantial independent evidence that Philip Morris fraudulently concealed the harmful and addictive properties of its cigarettes, which was consistent with the *Engle* Phase I findings on fraudulent concealment and conspiracy to conceal. Between the jury instructions and the type of evidence presented at trial, there is minimal risk that the jury imposed punitive damages based on conduct different from that which supported the liability findings on fraudulent concealment and conspiracy to conceal. Second, it was Philip Morris who argued that the jury must make its determination regarding the amount of punitive damages based solely on the evidence presented during trial. (*Id.* at 2600-02). Indeed, counsel for Philip Morris admitted that the jury could consider all of the evidence submitted in the case at hand. (*Id.* at 2602). Thus, even if it was error for the punitive damages verdict to be based on independent proof, it was an error that Philip Morris invited.

Next, Philip Morris argues that "Plaintiff cannot rely on a combination of independent proof and the *Engle* findings" because doing so "would create a reexamination problem under the Seventh Amendment of the United States Constitution."[11] (Doc. 211 at 11). As Philip Morris recognizes though, the Eleventh Circuit rejected this argument in *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1358 (11th Cir. 2018). The Eleventh Circuit held that, so long as the jury is neither asked nor required to speculate about the basis for the *Engle* findings, and so long as the jury determines punitive damages based on the defendant's specific conduct toward the plaintiff, there is no Reexamination Clause problem. *Id.* at 1357-58. Here, the Court gave materially similar jury instructions to the ones that the district court gave in *Searcy*. Like the district court in *Searcy*, this Court instructed the jury not to speculate about the evidence or the testimony underlying the

---

[11]     The Reexamination Clause states that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const., amend. VII.

*Engle* Phase I findings. (Doc. 94 at 19; Trial Tr. at 2363). The Court instructed the jury that the *Engle* Phase I findings "are determinative only as to the matters to which they relate. These findings establish only what they expressly state: you must not speculate about the basis for the findings." (Doc. 94 at 24; Trial Tr. at 2367). *Accord Searcy*, 902 F.3d at 1357. The Court further instructed the jury that in determining the amount of punitive damages to award, it could

> punish Philip Morris only for injury caused to Mrs. Berger by the specific conduct of Philip Morris that was the basis for your findings that Philip Morris is liable to Mrs. Berger on her claims involving fraudulent concealment and conspiracy to fraudulently conceal…. You must make your determination regarding the amount of punitive damages, if any, based solely on the evidence presented to you in this trial.

(Trial Tr. at 2653).

> In other words, the jury was instructed that any punitive damages award had to be based on the conduct of Defendants that caused [Mrs. Berger's COPD]. The jury was not asked to speculate about what the earlier *Engle* jury had found, but merely to examine the evidence that had been presented before it at trial to determine whether punishment of Defendants via additional damages was warranted.

*Searcy*, 902 F.3d at 1357.

The procedures and jury instructions followed in this case regarding punitive damages are similar to those followed in *Searcy*. Accordingly, allowing Mrs. Berger to recover punitive damages, based on the *Engle* Phase I findings and the independent proof introduced at trial, did not violate Philip Morris's rights under the Reexamination Clause. Therefore, Philip Morris's Renewed Motion for Judgment as a Matter of Law on Plaintiff's Punitive Damages Claims is due to be denied. (Doc. 211).

## IV. Renewed Motion to Amend the Judgment to Apply Credit for Guaranteed Sum in Accordance with Stipulation

Finally, Philip Morris argues that it is entitled to a dollar-for-dollar credit against the punitive damage award in this case based on a "Guaranteed Sum Stipulation" that Philip Morris

and the *Engle* class agreed to in 2001. (*See* Doc. 212-2, Stipulation). However, every district court of appeal in Florida to have addressed this argument has rejected it. *Philip Morris USA, Inc. v. Bryant*, 274 So. 3d 464, 466 (Fla. 1st DCA 2019) ("Bryant's judgment was an independent judgment, separate and apart from the *Engle* judgment. We therefore agree with the Second and Third Districts, which have held that the 2001 *Engle* stipulation does not require a credit against judgments in individual *Engle*-progeny cases."); *Philip Morris USA Inc. v. Boatright*, 217 So. 3d 166, 173 (Fla. 2d DCA 2017) ("[T]he Guaranteed Sum Stipulation specifically applied to the judgment in *Engle* and is not applicable to the judgment in this case."); *Philip Morris USA, Inc. v. Ledoux*, 230 So. 3d 530, 541 n.6 (Fla. 3d DCA 2017) (rejecting claim "that Defendants were entitled to a credit against the punitive damages judgment, based on the Guaranteed Sum Stipulation arising out of the original *Engle* litigation"); *Philip Morris USA, Inc. v. Howles*, 241 So. 3d 163 (Fla. 4th DCA 2018) (per curiam). These courts have ruled that the terms of the 2001 stipulation do not entitle the tobacco companies to an offset against punitive damages awarded in individual *Engle*-progeny cases.

The parties to the Guaranteed Sum Stipulation agreed that "the Stipulation is to be interpreted, construed, enforced and administered in accordance with the internal substantive laws (and not the choice of law rules) of the State of Florida." (Doc. 212-2 at ¶ 26). Therefore, the interpretation of the Guaranteed Sum Stipulation is a matter of Florida law. *See Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (contractual choice-of-law provisions are enforceable in Florida absent contravening public policy). While I independently agree with *Bryant*, *Ledoux*, *Boatwright*, and *Howles*, I also feel bound to defer to these decisions. Therefore, I will deny the Renewed Motion to Amend the Judgment to Apply Credit for Guaranteed Sum in Accordance with Stipulation.

## V. Conclusion

This rear-guard action by Philip Morris served no other purpose than to delay payment of the judgment that the Court of Appeals has ordered it to pay. Like all rear-guard actions, its fusillade of scattershot arguments had no hope of avoiding the ultimate outcome. Like obedient foot-soldiers, its attorneys dutifully followed the orders of those in charge, to whom the foreseeable result was of immaterial consequence. Indeed, it probably represented a good return on investment.

Under other circumstances I would issue an order to Philip Morris to show cause why it should not pay attorneys' fees and costs incurred by the plaintiff in this proceeding for, *inter alia*, engaging in vexatious litigation. Such, though, would no doubt bring about further skirmishing in the Court of Appeals, and serve the defendant's strategy of delay. I will not be its ally in its ongoing campaign: I will not issue such a show cause order.

But if Philip Morris unsuccessfully appeals this decision, founded as it is on common sense and long-standing, bedrock black-letter legal doctrine, I urge the Court of Appeals to issue such remedial sanctions as it deems proper.

Simply put: it is time for Philip Morris to pay the judgment. And is time for its lawyers to tell it to do so.

For the reasons expressed in the preceding sub-sections of this opinion, it is hereby

ORDERED THAT

1. Defendant's Renewed Motion for New Trial or in the Alternative Remittitur of the Punitive Damages Award (Doc. 210) is denied;

2. Defendant's Renewed Motion for Judgment as a Matter of Law on Plaintiff's Punitive Damages Claims (Doc. 211) is denied; and

3. Defendant's Renewed Motion to Amend the Judgment to Apply Credit for Guaranteed Sum in Accordance with Stipulation (Doc. 212) is denied.

So ordered.

/s/  James G. Carr
Sr. U.S. District Judge